## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BRISTOW GROUP INC., *et al.*,[1] | ) | Case No. 19-32713 (DRJ) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING THE DEBTORS TO CONTINUE TO USE CASH COLLATERAL, (C) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) MODIFYING THE AUTOMATIC STAY, AND (E) GRANTING RELATED RELIEF

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

THIS IS A MOTION FOR RELIEF FROM THE AUTOMATIC STAY. IF IT IS GRANTED, THE MOVANT MAY ACT OUTSIDE OF THE BANKRUPTCY PROCESS. IF YOU DO NOT WANT THE STAY LIFTED, IMMEDIATELY CONTACT THE MOVING PARTY TO SETTLE. IF YOU CANNOT SETTLE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY AT LEAST 7 DAYS BEFORE THE HEARING. IF YOU CANNOT SETTLE, YOU MUST ATTEND THE HEARING. EVIDENCE MAY BE OFFERED AT THE HEARING AND THE COURT MAY RULE.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

THERE WILL BE A HEARING ON THIS MOTION ON AUGUST 21, 2019, AT 2:00 P.M. (CDT) IN COURTROOM 400, 515 RUSK STREET, HOUSTON, TEXAS 77002, BEFORE THE HONORABLE DAVID R. JONES.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Bristow Group Inc. (9819), BHNA Holdings Inc. (8862), Bristow Alaska Inc. (8121), Bristow Helicopters Inc. (8733), Bristow U.S. Leasing LLC (2451), Bristow U.S. LLC (2904), BriLog Leasing Ltd. (9764), and Bristow Equipment Leasing Ltd. (9303). The corporate headquarters and the mailing address for the Debtors listed above is 2103 City West Blvd., 4th Floor, Houston, Texas 77042.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), among other things, (i) authorizing the Debtors to obtain access to the DIP Facility (as defined below) and enter into that certain Superpriority Secured Debtor-In-Possession Credit Agreement, attached hereto as **Exhibit B** (the "DIP Credit Agreement"), (ii) authorizing the Debtors to continue to use cash collateral in which any of the DIP Secured Parties (as defined below) or Prepetition Secured Parties have an interest, subject to certain restrictions, (iii) granting the DIP Liens and providing the DIP Superpriority Claims (each as defined below) on account of the obligations incurred by the Debtors under the DIP Facility, (iv) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the Order, and (v) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.      As described at the final cash collateral hearing, the Debtors have entered into an Amended and Restated Restructuring Support Agreement (as amended by the First Amendment to the Amended and Restated Restructuring Support Agreement dated July 24, 2019, the "Amended RSA") with approximately 99.3% of their prepetition secured term lenders and noteholders and 73.6% of their prepetition unsecured noteholders (collectively, the "Supporting

---

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the *Final Order (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to the Prepetition Consenting Secured Parties, (C) Modifying the Automatic Stay and (D) Granting Related Relief* [Docket No. 312] (the "Final Cash Collateral Order"), the DIP Credit Agreement or the Order, as applicable.

Noteholders"). The Amended RSA contemplates a comprehensive series of restructuring transactions pursuant to a chapter 11 plan of reorganization that will de-lever the Debtors' balance sheet, optimize their fleet plan, raise new go-forward capital through a $385 million equity rights offering and allow the Debtors to smoothly emerge from chapter 11.

2. The Amended RSA is predicated on a $150 million post-petition superpriority, priming debtor in possession credit facility (the "DIP Facility"), which is being provided by the Supporting Noteholders. The DIP Facility will provide $75 million of new money to fund the Debtors' operations and restructuring efforts and will pay down $75 million of the Debtors' outstanding Secured Notes. Significantly, under the terms of the RSA, the Supporting Noteholders have agreed to equitize the DIP Facility as part of a consensual plan of reorganization.

3. Access to the DIP Facility, combined with continued access to cash collateral under the terms in the Final Cash Collateral Order as modified by the Order (for so long as no occurrence of a Termination Date (as defined in the Order) has occurred, after which only the Final Cash Collateral Order shall govern the use of cash collateral), will allow the Debtors to responsibly fund the chapter 11 cases, continue their business operations, maintain the value of their assets, implement their long-term business plan, pay wages to their employees, and be in a position to fund their obligations under the terms of the plan of reorganization contemplated by the Amended RSA. Simply put, the DIP Facility provides needed financing and is an integral part of the comprehensive restructuring agreed to between the Debtors and the Supporting Noteholders. The DIP Facility provides a road to emerging with a de-levered balance sheet and a successful and sustainable future after emergence.

4. For these reasons, and for the reasons detailed herein, the Debtors believe that the relief proposed in the Order will provide the necessary amount of funding to maximize the value

of the Debtors' estates and is a sound exercise of the Debtors' business judgment.  Accordingly, the Debtors respectfully request that the Court enter the Order.

**JURISDICTION AND VENUE**

5.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over these cases, the Debtors, property of the Debtors' estates and this matter under 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order").  This is a core proceeding under 28 U.S.C. § 157(b).

6.     Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

7.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001 and Local Rule 4002-1.

**CONCISE STATEMENT OF THE MATERIAL TERMS OF THE ORDER PURSUANT TO BANKRUPTCY RULE 4001 AND THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS PROCEDURES FOR COMPLEX CHAPTER 11 CASES**

| DIP Facility Term | Relief Requested |
|---|---|
| **DIP Facility** | Authorizing the Borrower to obtain postpetition financing ("DIP Financing") pursuant to a senior secured, superpriority, priming debtor-in-possession credit facility (the "DIP Facility" and the loans incurred thereunder, the "DIP Loans") in an aggregate principal amount of $150,000,000 (the "Total DIP Commitment") solely on the terms and conditions set forth in the DIP Credit Agreement. |
| **DIP Documents** | Authorizing the Debtors to enter into the DIP Credit Agreement, attached hereto as **Exhibit B**, and certain ancillary documentation (together, with the DIP Credit Agreement, the "DIP Documents"). |
| **Adequate Protection** | Finding that the adequate protection provided to the Prepetition Secured Parties for any diminution in the value of their respective interests in the value of the Prepetition Collateral in the Final Cash Collateral Order is reasonable and sufficient to protect the interests of the Prepetition Consenting Secured Parties and any other parties holding interests that are secured by the Prepetition Collateral; *provided that* any Prepetition Secured Party, upon a change in circumstances, may request further or different adequate protection and the Debtors or any other party may contest any such request. |

| DIP Facility Term | Relief Requested |
|---|---|
| **Cash Collateral** | Authorizing the Debtors to continue to use Cash Collateral subject to the restrictions set forth in the DIP Documents, the Order and the Final Cash Collateral Order; *provided that* in the event that the Debtors' authority to use Cash Collateral under the Order is terminated, the terms of the Final Cash Collateral Order shall remain in full force and effect and shall govern the Debtors' use of Cash Collateral thereafter. |
| **Superpriority Claims and DIP Liens** | Granting to the DIP Secured Parties (i) superpriority administrative claims (the "DIP Superpriority Claims"), (ii) first priority senior priming liens upon all prepetition and postpetition property of the Debtor DIP Loan Parties (as defined below) of the same nature, scope, and type as the BGI Term Loan Collateral and the collateral securing the Secured Notes (the "DIP Priming Liens"), (iii) first priority senior liens upon all unencumbered tangible and intangible prepetition and postpetition property of the Debtor DIP Loan Parties (excluding Avoidance Actions but including the DIP Loan Proceeds Disbursement Account), and (iv) junior liens upon all tangible and intangible prepetition and postpetition property of each DIP Loan Party (but not property subject to existing security interests of the BULL Lombard Credit Facility Secured Parties) that is subject to either (a) valid, perfected, and non-avoidable prepetition liens (other than the BGI Term Loan Liens and the Secured Notes Liens granted by Debtor DIP Loan Parties and Liens with respect to the Bull Lombard Collateral, the Section 1110 Excluded Collateral, or the PK Collateral solely to the extent that the PK Credit Agreement and applicable law would permit the PK Credit Facility Secured Parties to exercise remedies as a result of such grant and unless such Primed Liens are otherwise permitted in accordance with the Order) or (b) valid non-avoidable prepetition liens that are perfected subsequent to the Petition Date, which security interest and lien shall be junior and subordinate to any valid, perfected, and non-avoidable Other Senior Liens on such property prepetition. |
| **Use of DIP Facility Proceeds** | Authorizing the Debtors to use proceeds of the DIP Facility as set forth in the DIP Documents (as defined below), solely in accordance with the Order and the DIP Documents (including the Budget (as defined below)). |
| **Automatic Stay** | Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Order. |
| **506(c) Waiver** | Authorizing the Debtors' waiver of the right to surcharge the Prepetition Collateral and the DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code.<br><br>In the event the consensual use of Cash Collateral is terminated, the Debtors and the Creditors' Committee reserve their rights under section 506(c) of the Bankruptcy Code solely with respect to costs and expenses incurred in respect of the DIP Collateral after the Termination Date and the DIP Secured Parties reserve their rights to contest any such assertion on any basis. |

8.      The following chart contains a summary of the material terms of the Order, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the United States Bankruptcy

Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases (the "<u>Complex</u>

<u>Case Procedures</u>").[3]

| Summary of Material Terms[4] | | Location |
|---|---|---|
| **Parties to the DIP Credit Agreement**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **<u>Borrowers</u>**. Bristow Group Inc. ("<u>Bristow Parent</u>") and Bristow Holdings Company Ltd. III (together with Bristow Parent, the "<u>Borrowers</u>" and, collectively with the Guarantors, the "<u>Obligors</u>" and, collectively with all direct and indirect subsidiaries of Bristow Parent, the "<u>Company</u>").<br><br>**<u>Guarantors</u>**. Each of the subsidiaries of Bristow Parent that is listed on Schedule 1 of the DIP Credit Agreement.<br><br>**<u>DIP Agent</u>**. Ankura Trust Company, LLC, as administrative agent and collateral agent for the DIP Facility (the "<u>DIP Agent</u>"), selected by DIP Lenders holding more than $66^2/_3\%$ of the aggregate outstanding Term Loans (the "<u>Required DIP Lenders</u>").<br><br>**<u>DIP Lenders</u>**. The lenders from time to time party to the DIP Credit Agreement (collectively, the "<u>DIP Lenders</u>" and together with the DIP Agent, collectively, the "<u>DIP Secured Parties</u>"). | Order, prmbl.<br><br>DIP Credit Agreement §§ 2.21(e), Schedule I, 5.10(a) |
| **Term**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The DIP Facility will mature on the earliest of:<br>(i)    one year from the entry of the Order;<br>(ii)   as directed by the Required DIP Lenders following and during the continuation of any Event of Default; and<br>(iii)  the Plan Effective Date. | DIP Credit Agreement § 1.1 |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B) | An aggregate principal amount of $150,000,000, $75,000,000 of which will be used to finance the Secured Notes Tender Offer (as defined in the DIP Credit Agreement) in accordance with the Semi-Annual Cash Flow Forecast (as defined in the DIP Credit Agreement). | Order, prmbl., ¶ 2(a); DIP Credit Agreement, prmbl., § 1.1, Schedule II |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Customary conditions of borrowing for financings of this type, including, among other things:<br><br>-    execution and effectiveness of DIP Documents;<br>-    payment of all fees and amounts due and payable to the DIP Lenders on the Effective Date;<br>-    satisfaction of all milestones;<br>-    compliance with the Budget; and<br>-    DIP Order, Final Cash Collateral Order and RSA shall all be in full force and effect. | DIP Credit Agreement § 3.1 |

---

[3]  The summaries contained in this Motion are qualified in their entirety by the provisions of the Order. To the extent anything in this Motion is inconsistent with the Order, the terms of the Order shall control.

[4]  Capitalized terms used in this table have the meanings given to such terms in the DIP Credit Agreement or the Order, as applicable.

| Summary of Material Terms[4] | | Location |
|---|---|---|
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Borrower shall pay interest (i) on each Base Rate Loan at the Base Rate (determined with reference to the highest of the prime lending rate, the Federal Funds Rate plus 0.50%, and the Eurodollar Rate for one month plus 1.00%) plus 5.00%, and (ii) on each Eurodollar Rate Loan at the Eurodollar Rate for the applicable Interest Period in effect for such Eurodollar Rate Loan plus 6.00%.<br><br>The Default Interest rate shall be an additional 2.00% in excess of the Interest Rate. | DIP Credit Agreement § 2.9 |
| **Parties with an Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | The Prepetition Secured Parties, including the Prepetition Consenting Secured Parties, the Macquarie Credit Facility Secured Parties, the PK Credit Facility Secured Parties, and the BULL Lombard Credit Facility Secured Parties. | Order ¶¶ 11, 19, Annex A |
| **Purposes for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The proceeds of the DIP Facility shall be used by the Debtors and their affiliates to provide working capital, fund the costs of the administration of the Debtors' bankruptcy cases and the consummation of the restructuring as provided in the forthcoming plan of reorganization.<br><br>$75 million of the DIP Facility will be used, promptly after the funding thereof, to repurchase the outstanding Secured Notes on a dollar-for-dollar basis (including principal, pre- and post-petition accrued and unpaid interest and all other amounts owed, with the exception of any make-whole or other premiums). | Order, ¶ 2(a); DIP Credit Agreement §§ 1.1, 5.9 |
| **Budget**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The use of cash and proceeds from the DIP Facility is subject to the Budget, attached as **Schedule 1** to the Order. | Order ¶ 10, Schedule I |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Commitment Fee of 2.00% (based on the Total DIP Commitment), which shall be fully earned and due and payable to the DIP Lenders by the Borrowers upon entry of the DIP Order; provided, however, that the Commitment Fee shall be reduced, without duplication, dollar-for-dollar by the amount of any commitment fee previously paid to any DIP Lenders pursuant to the Prior DIP Commitment Letter.<br><br>Exit Fee equal to 1.00% of the aggregate principal amount of any DIP Loan repaid or prepaid or that remain outstanding on the DIP Maturity Date, such fee to be fully earned on the closing of the DIP Facility and due and payable on each prepayment or repayment date on the portion of DIP Loans so prepaid or repaid, or on the DIP Maturity Date, as applicable.<br><br>Equitization Consent Fee equal to 10% of the amount of the DIP Facility paid in, at the election of each DIP Lender, common or preferred equity of the reorganized company upon the earlier of | DIP Credit Agreement §§ 2.10 |

| Summary of Material Terms[4] | | Location |
|---|---|---|
| | the Maturity Date and the termination of the Amended RSA.  If the maturity of the DIP Facility is accelerated prior to the effective date of the plan of reorganization, the Equitization Consent Fee shall instead be payable to each DIP Lender in cash equal to 5.0% of the amount of the funded DIP Facility.  Further, no Equitization Consent Fee shall be payable to any DIP Lender if (a) such DIP Lender does not fund its commitments under the DIP Credit Agreement or does not execute and fund its commitments under the Backstop Commitment Agreement, (b) there is a default under the Backstop Commitment Agreement, or (c) such other DIP Lender otherwise breaches or causes a default under the Amended RSA, in each case in the foregoing clause (a), (b), and (c), which breach or default results in the termination of the Amended RSA. | |
| **Adequate Protection**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The Order affirms that the adequate protection provided to the Prepetition Secured Parties for any diminution in the value of their respective interests in the value of the Prepetition Collateral in the Final Cash Collateral Order is reasonable and sufficient to protect the interests of the Prepetition Consenting Secured Parties and any other parties holding interests that are secured by the Prepetition Collateral; *provided that* any Prepetition Secured Party, upon a change in circumstances, may request, by motion on notice and after a hearing, further or different adequate protection and the Debtors or any other party may contest any such request. | Final Cash Collateral Order, ¶¶ 3–6; Order, ¶ 12 |
| **Reporting Information**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The Debtors shall deliver:<br><br>(a) on or before the last business day at the end of every four-week period, an updated Semi-Annual Cash Flow Forecast;<br><br>(b) on or before the last business day at the end of every two-week period, a Variance Report for the immediately preceding week(s) included in the latest Semi-Annual Cash Flow Forecast; and<br><br>(c) other standard and customary reporting requirements for similar debtor-in-possession financings. | DIP Credit Agreement § 5.1 |
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement will require compliance with the Case Milestones (as defined in the Amended RSA), which include:<br><br>- no later than five business days following the first business day after the Backstop Commitment Date, the filing of the Plan and Disclosure Statement;<br><br>- no later than August 19, 2019, entry of the Order;<br><br>- no later than three business days after the entry of the Order, the DIP Loan is fully drawn;<br><br>- no later than the date that is 5 business days after the filing of the Plan and the Disclosure Statement, the filing of a | DIP Credit Agreement §§ 1.1, 5.15, 8.1(d) |

| Summary of Material Terms[4] | | Location |
|---|---|---|
| | motion seeking entry of the Conditional Disclosure Statement Order by the Bankruptcy Court no later than 5 business days after the filing of such motion; | |
| | - in the event that the Bankruptcy Court refuses to enter the Conditional Disclosure Statement Order, entry of a Final Disclosure Statement Order no later than the date that is 40 days after the Bankruptcy Court refuses to enter the Conditional Disclosure Statement Order; | |
| | - 60 days after the entry of the Conditional Disclosure Statement Order, or if no Conditional Disclosure Statement Order is entered, 35 days after the entry of a Final Disclosure Statement Order, the entry of the Confirmation Order, the Final Disclosure Statement Order (to the extent entry of a Conditional Disclosure Statement Order has been entered) and the Approval Order by the Bankruptcy Court; and | |
| | - no later than December 18, 2019, substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan shall have occurred (subject to extension under certain limited circumstances set forth in the Amended RSA). | |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i) | The DIP Obligations shall be secured by:<br><br>(a) **DIP Superpriority Claims**.  Pursuant to Section 364(c)(1) of the Bankruptcy Code, joint and several superpriority administrative expense claim status with priority over any and all claims against the Loan Parties other than other superpriority administrative expense claims which are *pari passu*;<br><br>(b) **Liens Priming BGI Term Loan Liens and Senior Secured Notes Liens**. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtor DIP Loan Parties of the same nature, scope and type as the BGI Term Loan Collateral and Senior Secured Notes Collateral, regardless of where located, regardless whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected, including all Adequate Protection Liens of the "Adequate Protection Collateral" (as defined in the Final Cash Collateral Order) (the "**DIP Priming Liens**"), which shall prime in all respects the interests of the BGI Term Loan Secured Parties and Senior Secured Notes Secured Parties (but not the interests of the Macquarie Credit Facility Secured Parties, the PK Credit Facility Secured Parties or the BULL Lombard Credit Facility Secured Parties) arising from current and future liens of the BGI Term Loan Secured Parties and Senior Secured | Order, ¶ 5 |

| Summary of Material Terms[4] | Location |
|---|---|
| Notes Secured Parties (including, without limitation, the Adequate Protection Liens granted to the BGI Term Loan Secured Parties and Senior Secured Notes Secured Parties under the Final Cash Collateral Order) (the "**Primed Liens**").  Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (i) subject and junior to the Carve Out in all respects, (ii) senior in all respects to the BGI Term Loan Liens and the Senior Secured Notes Liens and (iii) senior to the Adequate Protection Liens under the Final Cash Collateral Order;<br><br>(c) **First Priority Liens on Unencumbered Property**. Pursuant to section 364(c)(2) of the Bankruptcy Code and to the extent not encompassed by the liens on "Adequate Protection Collateral" (as defined in the Final Cash Collateral Order) a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtor DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien, including the loan proceeds of the DIP Loans (net of any fees and expenses payable on the applicable funding date) (the "**Unencumbered Property**")<br><br>(d) **Liens Junior to Certain Other Liens**. Pursuant to sections 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible pre- and postpetition property of each Debtor DIP Loan Party and the proceeds, products, rents and profits thereof (but not property subject to the existing security interests of the BULL Lombard Credit Facility Secured Parties), whether arising under section 552(b) of the Bankruptcy Code or otherwise, that is subject to either (i) valid, perfected and non-avoidable liens (other than (A) the BGI Term Loan Liens and the Secured Notes Liens granted by Debtor DIP Loan Parties, which are Primed Liens pursuant to clause (i) above, (B) Liens with respect to the BULL Lombard Collateral, (C) the Section 1110 Excluded Collateral, or (D) the PK Collateral solely to the extent that the PK Credit Agreement and applicable law would permit the PK Credit Facility to exercise remedies as a result of the grant and, in each of (C) and (D), unless the Liens are otherwise permitted by the Order) in existence immediately prior to the Petition Date or (ii) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (any such liens described in the foregoing clauses (i) and (ii), the "Other Senior Liens"), which security interest and lien shall be junior and | |

| Summary of Material Terms[4] | | Location |
|---|---|---|
| | subordinate to any valid, perfected, and non-avoidable Other Senior Liens on such property in existence immediately prior to the Petition Date. | |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The "Carve Out" is an amount equal to the sum of<br><br>(i) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below);<br><br>(ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000 (without regard to the notice set forth in (iii) below); and<br><br>(iii) (A) all unpaid claims for fees, costs, disbursements and expenses to the extent allowed at any time, whether by interim order, final order, procedural order or otherwise of persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code or the Creditors' Committee (collectively, the "Professional Fees") incurred at any time on or prior to the Trigger Date, plus (B) Professional Fees incurred after the Trigger Date in an amount not to exceed $6,000,000(the "Carve Out Cap"), in each case subject to the limits imposed by this Order or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigation of the claims, liens and defenses against any Prepetition Secured Party | Order, ¶ 8 |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreement contains events of default upon (a) the termination of or other exercise of remedies by the U.K. government under the U.K. SAR contract and (b) the breach of any Case Milestone.  The DIP Credit Agreement also contains other events of default that are usual and customary for debtor-in-possession financings, including for:<br><br>(a)  non-payment of obligations;<br><br>(b)  material breach of representations and warranties;<br><br>(c)  breach of covenants, including, without limitation, failure to comply with the Semi-Annual Cash Flow Forecast (subject to any permitted variance); and<br><br>(d)  failure or invalidity of liens or obligations granted pursuant to the DIP Order or change in the priority thereof or other events adverse to the DIP Lenders' claims and security. | DIP Credit Agreement § 8.1 |
| **Waiver/Modification of the Automatic Stay** | The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit each of the DIP | Order, ¶ 13(b) |

| Summary of Material Terms[4] | | Location |
|---|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(iv) | Secured Parties to take all actions, as applicable, with regard to the perfection of DIP Liens pursuant to ¶ 12 of the Order. | |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The DIP Secured Parties are authorized, but not required, to file or record financing statements, trademark filings, aircraft registrations, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted in the Order.<br><br>Whether or not the DIP Secured Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, aircraft registrations, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (with the exception of any security interests arising under the Cayman Security Documents in respect of the non-U.S. situs assets). | Order, ¶ 13 |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Borrower shall indemnify the DIP Agent, each DIP Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all reasonable allocated fees and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party or Related Party of a Loan Party arising out of, in connection with, or as a result of (1) the execution or delivery of the DIP Credit Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (2) any Term Loan or the use or proposed use of the proceeds therefrom, (3) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (4) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or Related Party of a Loan Party, and regardless of whether any Indemnitee is a party thereto, *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and | DIP Credit Agreement § 10.3 |

| Summary of Material Terms[4] | Location |
|---|---|
| nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for material breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.  competent jurisdiction in a final and non-appealable decision). | |

## STATEMENT REGARDING SIGNIFICANT PROVISIONS

9.      The Order contains the following provisions (the "Significant Provisions") identified in the Complex Case Procedures.[5]

     a.      **Sale or Plan Confirmation Milestones**. The Amended RSA provides several Reorganization Milestones which are incorporated into the DIP Credit Agreement.  The Reorganization Milestones include a milestone for the entry of an order confirming the forthcoming plan of reorganization, which varies based on the timing of other plan-related milestones.  *See* DIP Credit Agreement § 5.15; Amended RSA § 6.02(f)(i)-(x).

     b.      **Cross-Collateralization**.   The Order does not provide for cross-collateralization.  The Order provides for adequate protection as specified under the Final Cash Collateral Order, which provides for adequate protection liens and superpriority claims against the Debtors, but limited to the extent of for any diminution in the value of respective interests in the value of the Prepetition Collateral.  *See* Order, ¶ 12; Final Cash Collateral Order, ¶¶ 3-6.

     c.      **Roll Ups**.  $75 million of the total DIP commitment will be used to pay down prepetition secured noteholder claims.  *See* Order, ¶ 2(a); DIP Credit Agreement, § 5.9.

     d.      **Liens on Avoidance Actions or Proceeds of Avoidance Actions**.  The Order provides for DIP Superpriority Claims on any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions; *provided* that prior to seeking payment of any DIP Superpriority Claims or DIP Liens

---

5       Pursuant to the Complex Case Procedures, ¶ 21, effective June 21, 2019, Debtor(s)'s counsel should highlight provisions of proposed orders issued under 11 U.S.C. §§ 363 or 364 that contain the following: a. Sale or plan confirmation milestones; b. Cross-collateralization; c. Roll ups; d. Liens on avoidance actions or proceeds of avoidance actions; e. Default provisions and remedies; f. Releases of claim against lender or others; g. Limitations on fees for advisors to official committees; h. Priming liens; i. Any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

from net proceeds of Avoidance Actions, the DIP Secured Parties shall use commercially reasonable efforts to first satisfy such claims or liens from all other DIP Collateral. *See* Order, ¶¶ 4, 15.

    e.    **Default Provisions and Remedies**. The DIP Loan Documents contain customary Events of Default provisions and will allow for remedies by the DIP Agent upon direction by the Required DIP Lenders. *See* DIP Credit Agreement § 8.1

    f.    **Releases of Claim Against Lender or Others**. The Order provides for the unconditional release and discharge of each of the DIP Secured Parties from any and all obligations and liabilities to the DIP Loan Parties, including the Debtors and the Guarantors. *See* Order, ¶ 17.

    g.    **Limitations on Fees for Advisors to Official Committees**. The Order does not provide for any limitations on fees owed to advisors to the Creditors' Committee or any other official committee.

    h.    **Priming Liens**. The Order provides the DIP Agent for its own benefit and the benefit of the DIP Lenders a first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtor DIP Loan Parties of the same nature, scope and type as the Term Loan Collateral and the collateral securing the Secured Notes, in each case to the extent held by a Debtor obligor. *See* Order, ¶ 5; DIP Credit Agreement § 2.22(a)(iii).

10. The explanation for the inclusion of the foregoing Significant Provisions, as required by Complex Case Procedures ¶¶ 21(a)–(i), which is made applicable by Bankruptcy Local Rule 1075-1, is that such Significant Provisions were necessary to obtain the DIP Lenders' (a) agreement to provide the DIP Facility on the terms and conditions reflected in the DIP Credit Agreement and (b) consent to equitize their DIP Loans, which the Debtors believe (for the reasons set forth herein) will benefit all parties in interest over the remainder of the Debtors' chapter 11 cases. In addition, certain of the Significant Provisions are merely continuing relief that the Court previously approved in the Final Cash Collateral Order, and which was necessary to obtain certain of the Prepetition Secured Parties' consent to the Debtors' use of Cash Collateral during these chapter 11 cases. As set forth herein, the DIP Facility is critical to the Debtors' successful reorganization efforts and granting the relief requested pursuant to the Order is critical to the

continued operation of the Debtors' businesses and will maximize the value of the Debtors' estates for all parties in interest.

11.     In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases. Accordingly, the Significant Provisions in the Order should be approved.

<strong><small>BACKGROUND</small></strong>

12.     On May 11, 2019 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

13.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On May 23, 2019, the United States Trustee appointed an official committee of unsecured creditors in these cases.  *See* Docket No. 179.  The Debtors filed their schedules and statements of financial affairs on July 12, 2019.

14.     Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of Brian Allman in Support of First Day Pleadings* [Docket. No. 25] (the "First Day Declaration").  The Debtors also respectfully submit the *Declaration of Bradley Jordan in Support of the Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* (the "Jordan Declaration"), attached hereto as **Exhibit C**, in further support of this Motion.

15

### 1.  The Debtors' Prepetition Secured Debt Obligations

15.     A detailed summary of the Debtors' prepetition secured debt obligations is provided in the *Debtors' Emergency Motion for Interim and Final Orders (1) Authorizing the Debtors to Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 105, 361, 362, 363 and 507 of the Bankruptcy Code; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* [Docket No. 41].  The Debtors' secured debt obligations are summarized by the following table:

| Obligation | Priority Against Debtors[6] | Amount[7] |
|---|---|---|
| 2019 Secured Term Loan | Secured | $75 million |
| 8.75% Senior Secured Notes due 2023 | Secured | $350 million |
| Lombard Debt (U.S. & U.K.) | Secured | $183 million |
| Macquarie Debt | Secured | $171 million |
| PK Air Debt | Secured | $210 million |

## II.  The Original RSA and Authority to Use Cash Collateral

16.     As described in the First Day Declaration, prior to the Petition Date, the Debtors and an ad hoc group of holders of Secured Notes (the "Secured Noteholders Group") entered into a restructuring support agreement (the "Original RSA") that, among other things, provided a $75 million prepetition term loan (the "BGI Term Loan") and a $75 million postpetition financing commitment (the "Original DIP Commitment").  Jordan Decl. ¶ 6.

17.     Prior to entering into the Original RSA, the Debtors, through their investment banker Houlihan Lokey, reached out to multiple parties to solicit bids for potential financing.

---

[6]  The table is for illustration and summary purposes only.  The Debtors do not admit to the validity, priority and/or allowance of any claim, lien or interest in property and reserve rights in relation to such issues.  A material portion of the above-listed debt is guaranteed by BGI on an unsecured basis.

[7]  The amounts tabulated above reflect the outstanding principal amounts owed, and do not include accrued and unpaid interest, fees, premiums or other related claims.

Jordan Decl. ¶ 6.  In addition to the proposal from the Secured Noteholders Group, the Debtors received a number of proposals from an ad hoc group of holders of Unsecured Notes (the "Ad Hoc Group of Unsecured Noteholders"), as well as two formal proposals from third parties.  *Id*. Because of the implications of their existing position in the Debtors' capital structure, their willingness to provide pre-petition financing and their willingness to provide new capital at emergence, the Debtors elected to engage further with the two noteholder groups rather than the third-party financing parties.  Ultimately, the Debtors, in their business judgement, concluded that the Secured Noteholder Group's proposal was superior because it offered the best terms and allowed the Debtors to go into chapter 11 with an agreement for the use of cash collateral and a path towards a consensual resolution of the chapter 11 cases.  Jordan Decl. ¶ 7.

18.     Additionally, the Debtors engaged in negotiations with their prepetition secured lenders and reached an agreement for the consensual use of their Cash Collateral, as well as the continued use of other collateral important to the Debtors' operations.  Jordan Decl. ¶ 7.  Access to Cash Collateral has allowed the Debtors to smoothly transition into chapter 11, however, the Debtors have always contemplated the eventual need for postpetition financing.  Jordan Decl. ¶ 8. In exchange for their consent, the Prepetition Secured Parties required, among other things, an adequate protection package that provided protection against any postpetition diminution in value of their collateral resulting from the use, sale, or lease of the collateral by the Debtors and the imposition of the automatic stay in the following forms: superpriority claims under section 507(b) of the Bankruptcy Code; replacement adequate protection liens; and current payment of interest (and, in the case of Lombard, principal).  Jordan Decl. ¶ 7; Final Cash Collateral Order ¶¶ 3,4 and 5.   Pursuant to the Final Cash Collateral Order, the Prepetition Secured Parties also received

payment of fees and expenses, current reporting under the applicable Prepetition Debt Documents, and adherence to certain case milestones.  Final Cash Collateral Order ¶¶ 3,4 and 5.

19.     The Court approved the use of Cash Collateral in an interim order, entered on May 14, 2019 [Docket No. 98] and the Final Cash Collateral Order, entered on June 28, 2019.  The Final Cash Collateral Order (as modified by the Order) continues to authorize and govern the Debtors' use of the Prepetition Secured Parties' Cash Collateral and is incorporated by reference into the Order.

**III.  The Amended RSA and DIP Commitment Letter**

20.     Over the course of their chapter 11 proceedings the Debtors have continued to engage with their various creditor constituencies to secure the terms of a value-maximizing and consensual reorganization, including the need for additional liquidity.  Due in large part to the efforts of the Debtors and their creditors to consensually advance the Debtors' restructuring goals, the Debtors have continued to operate their businesses in the ordinary course and their restructuring efforts continue to be on track.

21.     Specifically, the Debtors, the Secured Noteholders Group, and the Ad Hoc Group of Unsecured Noteholders negotiated and worked towards a new restructuring support agreement that would provide the Debtors with additional liquidity and exit funding and maximize recoveries to all creditors in order to allow the Debtors to quickly emerge from these chapter 11 proceedings on a consensual basis. Jordan Decl. ¶ 8.  On June 27, 2019, the Debtors entered into the Amended RSA with holders of approximately 89.84% of the Senior Secured Notes and holders of approximately 54.54% of the Unsecured Notes.  *Id.*  Since the execution of the Amended RSA, additional parties signed the Amended RSA, and as of the date hereof, holders of approximately 99.3% of the outstanding Secured Notes and 73.6% of the Unsecured Notes are now party to the

Amended RSA. Under the terms of the Amended RSA, the Secured Noteholders Group and the Ad Hoc Group of Unsecured Noteholders will commit to backstop $37.5 million and $347.5 million, respectively, of a $385 million rights offering to purchase new equity interests in the reorganized company, subject to the negotiation and execution of a definitive backstop commitment agreement. *Id.* Notably, holders of claims arising from the Unsecured Notes will receive (i) in exchange for their Unsecured Notes, new equity interests of the Company, as reorganized pursuant to the forthcoming plan of reorganization and (ii) up to $347.5 million of the rights offering. Additionally, holders of claims arising from the Secured Notes will receive cash equal to 97% of their claims, and (ii) a pro rata share of up to $37.5 million of the rights offering. In exchange for these recoveries under the plan, the Secured Notes and Unsecured Notes will be cancelled and discharged pursuant to the plan.

22. As to the Debtors' liquidity needs, the Debtors' use of existing Cash Collateral, while necessary, was insufficient to meet the long term needs and goals of the Debtors' restructuring efforts and business operations. Jordan Decl. ¶ 16. To address this impending shortfall, one critical component of the Amended RSA is the commitment by the Secured Noteholders Group and the Ad Hoc Group of Unsecured Noteholders to fund the DIP Facility consistent with the terms of the Amended RSA. Jordan Decl. ¶ 8. Specifically, as part of entering into the Amended RSA, the Debtors entered into a new commitment letter on June 27, 2019 (the "DIP Commitment Letter") and a new DIP Facility term sheet attached to the DIP Commitment Letter (the "DIP Term Sheet"), whereby certain members of the Secured Noteholders Group and certain members of the Ad Hoc Group of Unsecured Noteholders agreed to provide the Debtors with the DIP Facility in an aggregate principal amount of $150 million, with $37.5 million funded by members of the Senior Noteholder Group and the other $112.5 million funded by the Ad Hoc

19

Group of Unsecured Noteholders. Jordan Decl. ¶ 8. Until the Court's approval of this Motion and the entry of the Order, the Prior DIP Commitment Letter, as amended, will remain in place and available to the Debtors.[8]

23.     Of the $150 million proposed DIP Facility, $75 million will be used to pay down on a dollar-for-dollar basis amounts outstanding under the Secured Notes (including principal, accrued and unpaid interest and all other amounts owed), with the remaining $75 million to be used for general business operations and corporate purposes. The Debtors have publicly disclosed further details regarding the Amended RSA, the DIP Commitment Letter, and the proposed new DIP Facility in its filings with the SEC.[9]  The Debtors believe that the new DIP Facility is superior to the financing under the Prior DIP Commitment Letter because, in addition to providing financing that is at least as beneficial as the financing contemplated by the Prior DIP Commitment Letter, the new DIP Facility provides a clear pathway to emergence in connection with a consensual plan of reorganization (as set forth in the Amended RSA). Jordan Decl. ¶ 8. Significantly, the Supporting Noteholders have agreed in the Amended RSA to equitize outstanding amounts under the DIP Facility as part of such consensual plan of reorganization. Jordan Decl. ¶ 9.

### THE DEBTORS' NEED FOR DIP FINANCING

24.     The Debtors require access to the DIP Facility in addition to continued use of Cash Collateral pursuant to the Final Cash Collateral Order (as modified by the Order). As of the date of this Motion, the Debtors' unrestricted cash balance is insufficient to operate their enterprise and continue paying their debts as they come due. Jordan Decl. ¶ 16. The Debtors' business is cash

---

[8] The lenders' commitments under the Prior DIP Commitment Letter expire on August 9, 2019 unless definitive documentation for the DIP Facility has been executed and delivered.

[9] *See* Bristow Group Inc., Current Report (Form 8-K) (June 27, 2019).

intensive, with significant daily costs required to satisfy obligations to vendors and employees. *Id.* As such, the Debtors require access to the DIP Facility and the use of Cash Collateral to operate their business, preserve value, and emerge from chapter 11 with a healthy, sustainable balance sheet. *Id.* The Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs, the projected costs of these chapter 11 cases and make the cash outlays necessary under the plan of reorganization without the DIP Facility. *Id.*

**BASIS FOR RELIEF**

**a. The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.**

      **A.    Entering into the DIP Documents and Payment of Fees Thereunder is an Exercise of the Debtors' Sound Business Judgment.**

25.    The Court should authorize the Debtors, in exercising their sound business judgment, to enter into the DIP Documents, obtain postpetition DIP financing under the DIP Facility, and continue using Cash Collateral. Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions and underlying policy considerations of the Bankruptcy Code. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

21

26.     To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

27.     Moreover, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender to determine whether the terms of a postpetition financing arrangement are fair and reasonable. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

28.     The Debtors' entry into the DIP Facility represents a sound exercise of their business judgment.  A result of good-faith, arm's-length negotiations, the DIP Facility is critical for the Debtors to execute and complete their restructuring efforts successfully.  No alternative sources of financing with terms as favorable as those contained in the DIP Facility are currently available to the Debtors based on the proposals received when the Debtors' advisors approached the market to solicit post-petition financing.  *See* Jordan Decl. ¶ 17.

29.     The DIP Facility, funded jointly by certain secured noteholders and unsecured noteholders, provides approximately $75 million in incremental liquidity and pays down $75 million of the outstanding amount of the Debtors' outstanding Secured Notes.  This pay down of prepetition debt is a material component of the DIP Facility and is a cornerstone of the Amended

RSA between the Debtors and the Supporting Noteholders.  Jordan Decl. ¶ 8.  In addition to providing the Debtors with incremental liquidity, the DIP Facility will provide the Debtors with continued access to the use of the Cash Collateral on a consensual basis, and will allow the Debtors to fund their businesses in the ordinary course, which will ensure safe, continued operations, thus preserving the value of their estates for the benefit of all stakeholders.  Jordan Decl. ¶ 9.

30.     The proposed use of a portion of the funds from the DIP Facility to pay down the outstanding Secured Notes is also an exercise of the Debtors' sound business judgment.  Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g., In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity").  The business judgment rule shields a debtor's management from judicial second guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

31.     Repayment of prepetition debt is a common feature in debtor-in-possession financing arrangements, particularly when done pursuant to final order only.  Courts in this and other jurisdictions have approved similar DIP features in other cases.  *See e.g.*, *In re Vanguard Natural Resources, Inc.* (DRJ) (Bankr. S.D. Tex. Apr. 30, 2019) (authorizing $130 million DIP that included $65 million roll up of prepetition debt); *In re Westmoreland Coal Company* (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (authorizing $110 million DIP that included $90 million to refinance prepetition debt); *In re Gastar Exploration, Inc.*, No. 18-36057 (MI) (Bankr. S.D. Tex.

Nov. 26, 2018) (authorizing approximately $383 million DIP that included repayment of approximately $283 million of prepetition debt); *In re Shoreline Energy LLC*, No. 16-35571 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016) (authorizing approximately $50 million DIP that included refinancing of $32 million in prepetition debt); *In re Black Elk Energy Offshore Operations, LLC*, No. 15-34287 (MI) (Bankr. S.D. Tex. Mar. 18, 2016) (authorizing approximately $15 million DIP that included refinancing of approximately $7.5 million in prepetition debt); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Sept. 20, 2012) (authorizing approximately $618 million DIP that included refinancing of approximately $368 million in prepetition debt); *In re Toys "R" US, Inc.*, No. 17- 34665 (KLP) (Bankr. E.D. Va. Sept. 20, 2017) (authorizing $1.305 billion repayment of prepetition obligations from proceeds of DIP loan); *In re BPS U.S. Holdings Inc.*, No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016) (authorizing $331.3 million repayment of prepetition obligations from proceeds of the DIP loan).

32.     Absent the DIP Facility, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest.  Further, the DIP Lenders represent a significant portion of the Debtors' prepetition capital structure and have entered into the Amended RSA, under which they have agreed to equitize significant portions of their claims against the Debtors' including the claims under the DIP Facility.  Given these circumstances, repayment of the outstanding Secured Notes is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

33.     Further, as set forth in the Jordan Declaration, the Debtors believe that the fees and expenses to be paid under the DIP Credit Agreement are reasonable.  *See* Jordan Decl. ¶ 13.  The Debtors have agreed, subject to the Court's approval, to pay a commitment fee to the DIP Lenders pursuant to the DIP Loan Documents of 2.0% of the $150 million Total DIP Commitment

(provided that such commitment fee shall not be paid to any DIP Lender that had previously received a commitment fee pursuant to the Original DIP Commitment), and an exit fee equal to 1.0% of the aggregate principal amount of any repaid or prepaid portion of the Total DIP Commitment upon the date of such repayment or prepayment, or the aggregate principal amount outstanding (and that is not being equitized) upon the Maturity Date (as defined in the DIP Credit Agreement, the "DIP Maturity Date"). *See* DIP Credit Agmt. § 2.10.

34.    Additionally, in exchange for the DIP Lenders' agreement to convert their DIP Facility claims to equity interests in the reorganized company, the Debtors have agreed, subject to the Court's approval, to pay an Equitization Consent Fee (as defined in the Amended RSA) equal to 10% of the amount of the DIP Facility paid in, at the election of each DIP Lender, common or preferred equity of the reorganized company upon the earlier of the DIP Maturity Date and the termination of the Amended RSA. *See* DIP Credit Agmt. § 2.10. If the maturity of the DIP Facility is accelerated prior to the effective date of the plan of reorganization, the Equitization Consent Fee shall instead be payable to each DIP Lender in cash equal to 5.0% of the amount of the funded DIP Facility. Further, no Equitization Consent Fee shall be payable to any DIP Lender if (a) such DIP Lender does not fund its commitments under the DIP Credit Agreement or does not execute, and fund its commitments under the Backstop Commitment Agreement, (b) there is a default under the Backstop Commitment Agreement, or (c) such other DIP Lender otherwise breaches or causes a default under the Amended RSA, in each case in the foregoing clause (a), (b), and (c), which breach or default results in the termination of the Amended RSA. *Id*.

35.    These fees were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the DIP Agent and the DIP Lenders as consideration for the extension of

postpetition financing.  Jordan Decl. ¶ 13.  Indeed, the Debtors' negotiations with the DIP Lenders resulted in reductions in proposed fees and interest rates as well as improvements in other economic terms over the course of negotiations.  *Id*.  Under the current circumstances, the fees provided for in the DIP Facility are reasonable.  *Id*.  Accordingly, the Court should authorize the Debtors to pay the fees and expenses provided under the DIP Loan Documents in connection with the DIP Facility.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

36.      The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) and (d) of the Bankruptcy Code. Significantly, the Debtors propose to provide, subject to the Carve Out, at all times: (a) the DIP Superpriority Claims; (b) first priority priming senior liens on the BGI Term Loan Collateral and the collateral securing the Secured Notes, in each case to the extent held by a Debtor Obligor; (c) first priority senior liens on all other present and after-acquired unencumbered property or other property otherwise not subject to validly perfected liens (whether tangible, intangible, real, personal or mixed and wherever located) of the Debtors, including without limitation proceeds of avoidance actions and the DIP Loan Disbursement Account; and (d) junior liens on (i) all BGI Term Loan Collateral held by a non-Debtor Obligor and (ii) all collateral that is subject to validly perfected liens as of the date of filing of the Chapter 11 Cases permitted under the BGI Term Loan and the Secured Notes (but not the Bull Lombard Collateral, the Section 1110 Excluded Collateral, or the PK Collateral soley to the extent that the PK Credit Agreement and applicable law would permit the PK Credit Facility Secured Parties to exercise remedies as a result of such grant and unless such Primed Liens are otherwise permitted in accordance with the Order).  *See* Jordan Decl. ¶ 10; DIP Credit Agmt. § 2.22.

26

37.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

38.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;
>
> b.    the credit transaction is necessary to preserve the assets of the estate; and
>
> c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); Crouse Group, 71 B.R. at 549.

39.     No party contacted by the Debtors' advisors during the DIP Facility marketing process was interested in providing, or willing to provide, a holistic package of postpetition financing to the Debtors on an unsecured basis.  *See* Jordan Decl. ¶ 17.  Indeed, no constituency was willing to provide a holistic package of postpetition financing on anything other than a superpriority or priming basis with respect to some or all of the secured equipment financing

facilities, BGI Term Loan Collateral and the collateral securing the Secured Notes. *Id*. The only option to achieve the favorable terms of the DIP Facility and the Amended RSA was for the Debtors to enter into an arrangement with the DIP Lenders whereby the DIP Facility would be secured by first priority priming liens; no other party offered sufficient postpetition financing on more favorable terms to meet the Debtors' liquidity and capital needs to successfully reorganize and emerge from chapter 11. *Id*.

40.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). As such, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Creditors have consented or (b) the Prepetition Secured Creditors' interests in collateral are adequately protected. Here, the Prepetition Secured Parties have consented to the priming liens securing the DIP Facility (which consent shall automatically terminate and be deemed null and void *ab initio* if there is a termination event under the RSA, the Order, or the Final Cash Collateral Order). Further, the Debtors will continue to provide adequate protection set forth in the Final Cash Collateral Order, whereby Debtors provide the Prepetition Secured Parties with safeguards to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay in the form of superpriority claims under section 507(b) of the Bankruptcy Code, replacement adequate protection liens and current payment of interest (and, in the case of Lombard, principal). Jordan Decl. ¶ 11. The Prepetition Secured Parties will also

receive payment of fees and expenses, current reporting under the applicable Prepetition Debt Documents, and adherence to certain case milestones. *Id.* Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

### C. No Comparable Alternative to the DIP Facility Is Reasonably Available

41.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods.*, Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

42.      Here, the Debtors have made a good faith effort to seek out optimal postpetition financing arrangements to meet their longer-term restructuring objectives. Jordan Decl. ¶ 17. While the Debtors entered into these chapter 11 proceedings with the financial support of the Prepetition Secured Parties, the Amended RSA and DIP Facility represent a superior solution to the Debtors' financing needs because they represent a consensual path forward in these chapter 11

cases that maximizes value and provides needed improvements to their balance sheet upon emergence. Accordingly, the DIP Facility represents the best option available to address the Debtors' immediate liquidity needs, and the Debtors respectfully submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances.

## II.    The Use of Cash Collateral is Warranted and Should Be Approved.

43.    Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). Although section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case by case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp., No.* 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); In re Columbia Gas Sys., Inc., Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")); See *In re Columbia Gas Sys.*, Inc., No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citation omitted)). Courts generally have found that using cash collateral to preserve the value of the

secured creditors' collateral is a form of adequate protection in itself.  *See, e.g., In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral from shopping center to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).

44.     Through this Motion, the Debtors seek the continued use of the Cash Collateral on the terms set forth in the Final Cash Collateral Order (which are incorporated into the proposed Order by reference), subject to certain limitations.  The Final Cash Collateral Order was carefully calibrated and highly negotiated, and provided for the use of the Prepetition Secured Parties' use of Cash Collateral in exchange for a comprehensive adequate protection package. Jordan Decl. ¶ 7.  That package provides safeguards to protect against the post-petition diminution in value of the collateral resulting from the use, sale, or lease of the collateral by the Debtors and the imposition of the automatic stay.  Significantly, the adequate protection package resolved the use of Cash Collateral on a consensual basis avoiding foreseeable litigation that would have been value destructive and unhelpful for moving the Debtors' cases forward.

45.     The Debtors propose to provide an adequate protection package equivalent to that set forth in the Final Cash Collateral Order.  The Prepetition Secured Parties would not have consented to the Debtors' use of collateral, including Cash Collateral, without the adequate protection provided in the Final Cash Collateral Order.  Obtaining the use of collateral consensually saved the Debtors' estates amounts far in excess of what it could cost to litigate non-consensual use.  This is especially so here, where certain lenders have additional rights to invoke remedies against the Debtors or the Debtors' non-debtor subsidiaries—even if they are ordered to allow the Debtors to use Cash Collateral without their consent—which make taking that path untenable.  Specifically:

31

a.    The adequate protection package provided to Lombard is necessary to maintain a critically important event of default waiver as to a non-debtor, BALL, as to a separate U.K. secured equipment facility. Preserving the status quo with respect to the five helicopters that serve as collateral for the BALL facility, and which are used to perform under the Debtors' UK subsidiary's contract with the UK government for search and rescue services, one of Company's most valuable assets, is crucial to maintain the value of the Debtors' enterprise.

b.    Collateral securing the Senior Secured Notes, the BGI Term Loans and the Macquarie Credit Facility are aircraft owned by Bristow U.S. LLC, the holder of an aircraft operating certificate in the United States. Such collateral is subject to section 1110 of the Bankruptcy Code. Under section 1110, secured parties have the right on July 9, 2019, absent an agreement of the parties extending the date, to take possession of aircraft collateral to the extent the applicable debtor fails to cure and pay current all regularly-scheduled debt payments when due and owing under the terms of the parties' secured agreements.

c.    Similarly, PK's collateral is aircraft owned by Bristow Equipment Leasing Ltd. PK's collateral could be protected by the Cape Town Treaty, which PK argues provides it with similar rights to repossess the aircraft that a secured party would have with respect to a Debtor operator under section 1110.

Given these potential consequences, and the fact that the Debtors would be forced to address them anyway, the consensual use of collateral, including Cash Collateral, is preferred.

46.    The Debtors believe that the proposed adequate protection in the Order and DIP Loan Documents is necessary and sufficient for the Debtors to continue to use Cash Collateral. Jordan Decl. ¶ 16. Accordingly, the Debtors submit that the adequate protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.

47.    Courts in this district and others have approved similar adequate protection packages in other recent chapter 11 cases. *See, e.g., In re EXCO Resources, Inc.*, No. 18-30155 (MI) (Bankr. S.D. Tex. Jan. 16, 2018) (granting superpriority administrative claims, adequate

protection replacement liens, adequate protection payments, and fees and expenses on an interim basis to the applicable prepetition secured creditors); *In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016) (same); *In re Energy XXI LTD.*, No. 16-31928 (DRJ) (Bankr. S.D. Tex. Apr. 15, 2016) (same); *In re Goodrich Petrol. Corp.*, No. 16-31975 (MI) (Bankr. S.D. Tex. Apr. 18, 2016) (same); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Mar. 29, 2016) (same).

48.     Further, the Prepetition Secured Parties will inherently benefit from the Debtors' continued use of the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall value. *See, e.g., 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

49.     The Debtors believe continuation of the consensual use of Cash Collateral set forth in the Final Cash Collateral Order are reasonable, consistent with the Bankruptcy Code and applicable Fifth Circuit law, and in the best interest of the Debtors' estates and all stakeholders. The Debtors therefore seek authority to continue to use Cash Collateral on the terms of the Final Cash Collateral Order, as incorporated by reference and modified by the terms of the Order.

**III.     The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection Under Section 364(e).**

50.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

51.     The DIP Facility is the result of the Debtors' reasonable judgment and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and extensive arm's-length, good-faith negotiations between the Debtors and the DIP Lenders.  The Debtors submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Agent and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code, and therefore the DIP Agent and DIP Lenders are entitled to all of the protections afforded thereby.

**IV.     The Automatic Stay Should be Modified on a Limited Basis.**

52.     The Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements,

security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Order. The proposed Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Order.  Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Vanguard Natural Resources, Inc.* (DRJ) (Bankr. S.D. Tex. Apr. 30, 2019) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Westmoreland Coal Company* (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 17, 2012) (same); *In re MPF Holdings US LLC*, No. 08-36084 (JB) (Bankr. S.D. Tex. Feb. 18, 2009) (same); *see also In re TMP Directional Mktg.*, LLC, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (same).  The Debtors therefore submit that the modification of the automatic stay as set forth in the Order should be approved.

### WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

53.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

54.      Nothing contained herein is intended or shall be construed as: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay prepetition claims; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## NOTICE

55.      The Debtors will provide notice of this Motion to (a) the U.S. Trustee; and (b) all other parties on the Master Service List.  The Debtors respectfully submit that such notice is sufficient and that no further notice of this Motion is required.

## NO PRIOR REQUEST

56.      No prior request for the relief sought herein has been made to this or any other Court.

*[Remainder Intentionally Left Blank]*

36

**WHEREFORE**, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion, and granting such other and further relief the Court may deem proper.

Dated: July 25, 2019

Respectfully submitted,

**BAKER BOTTS L.L.P.**

*/s/ Emanuel C. Grillo*
James R. Prince, State Bar No. 00784791
Omar J. Alaniz, State Bar No. 24040402
Kevin Chiu, State Bar No. 24109723
**BAKER BOTTS L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone: (214) 953-6500
Facsimile: (214) 953-6503
Email: jim.prince@bakerbotts.com
        omar.alaniz@bakerbotts.com
        kevin.chiu@bakerbotts.com


-and-


Emanuel C. Grillo (*pro hac vice*)
Chris Newcomb. (*pro hac vice*)
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, New York   10112-4498
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
Email: emanuel.grillo@bakerbotts.com
        chris.newcomb@bakerbotts.com


*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**WACHTELL, LIPTON, ROSEN & KATZ**

Richard G. Mason (*pro hac vice*)
Amy R. Wolf (*pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000
Email: rgmason@wlrk.com
        arwolf@wlrk.com


*Proposed Co-Counsel to the Debtors and Debtors in Possession*