**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BRISTOW GROUP, INC., *et al.*,[1] | § | Case No. 19-32713- (DRJ) |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |

**THE AD HOC COMMITTEE OF EQUITY SECURITY HOLDERS' OBJECTION**
**TO (1) THE DEBTORS EMERGENCY MOTION FOR CONDITIONAL APPROVAL OF**
**THEIR DISCLOSURE STATEMENT [DKT. 520] AND (2) THE DEBTORS'**
**DISCLOSURE STATEMENT [DKT. 499]**

The Ad Hoc Committee of Equity Security Holders (the "Equity Committee") submits the following objection (the "Objection") to the (1) the *Emergency Motion For Entry Of An Order (I) Conditionally Approving The Adequacy Of The Disclosure Statement, (II) Approving The Solicitation And Notice Procedures With Respect To Confirmation Of The Plan, (III) Approving The Form Of Various Ballots And Notices In Connection Therewith, (IV) Approving The Rights Offering Procedures, And (V) Approving The Scheduling Of Certain Dates In Connection With Confirmation Of The Plan* [Dkt. 520] (the "DS Motion") filed by Bristow Group, Inc. et al (the "Debtors") and (2) the *Disclosure Statement For The Joint Chapter 11 Plan Of Reorganization Of Bristow Group, Inc. And Its Debtor Affiliates* [Dkt. 499] (the "Disclosure

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Bristow Group Inc. (9819), BHNA Holdings Inc. (8862), Bristow Alaska Inc.. (8121), Bristow Helicopters Inc. (8733), Bristow U.S. Leasing LLC (2451), Bristow U.S. LLC (2904), BriLog Leasing Ltd. (9764), and Bristow Equipment Ltd. (9303). The corporate headquarters and mailing address for the Debtors listed above is 2103 City West Blvd., 4th Floor, Houston, Texas 77042.

Statement"), which describes the *Joint Chapter 11 Plan of Reorganization of Bristow Group, Inc. and It's Debtor Affiliates* [Dkt. 498] (the "Plan").[2]

## I.   PRELIMINARY STATEMENT

1.      Chapter 11 provides a process for businesses to reorganize or, if warranted, to liquidate.  Chapter 11 was not conceived as a device to enable a debtor to evade its fiduciary duties and wipe out the interests of its shareholders in violation of applicable law.  This Court should not countenance unlawful and inequitable conduct which perverts the beneficial and economically necessary policies of the Bankruptcy Code into a vehicle that allows debtors and certain creditors with a bare, unsupported valuation number that is only for settlement purposes to wipe out the Existing Equity interests of investors who have relied upon the Debtors' multiple public filings in which a healthy and viable business with substantial Existing Equity was presented.

2.      As will be demonstrated below, the Debtors' Disclosure Statement should not be approved for three reasons:

a.      There is no legitimate reason to truncate the Disclosure Statement approval process in the form of a "conditional approval" except to force the Equity Committee to address the key issue of valuation in these cases without the necessary time and tools.  Indeed, the Debtors have posited a valuation number for "settlement purposes only" (the "Settlement Purposes Only Valuation"), which, by its own definition, can be

---

[2] Capitalized terms not otherwise defined herein have the meanings attributed to them in the Debtors' Disclosure Statement and Plan, and the exhibits thereto.  Since the Debtors are currently only seeking conditional approval of the Disclosure Statement, the Equity Committee reserves its right to make additional objections to the Disclosure Statement.

used for no other purposes, and the Debtors have provided no substantiated valuation.[3] The only stated basis for the expedited process is the significant administrative expenses being incurred monthly in these cases, which, while of concern, is the same in every sizeable case around the country. Incurrence of administrative expenses alone is not sufficient basis to limit the procedural protections provided under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure for approval of disclosure statements and confirmation of chapter 11 plans.

      b.    The Disclosure Statement fails to provide the requisite information necessary for parties to vote on and/or object to the Plan. Crucial to this Plan and the interests of Existing Equity, is the valuation of the Debtors. There is no such valuation in the Disclosure Statement; there is merely the $1.25 billion Settlement Purposes Only Valuation, a number provided only for settlement purposes and with no basis in fact.[4] It cannot be that a Plan that proposes to wipe out Existing Equity provides in the accompanying Disclosure Statement only a valuation number and no basis for such valuation.

---

[3] *See* (1) Plan [Dkt. 498], Exhibit "A" (the Amended RSA), at Exhibit "A" thereto (the Amended Restructuring Term Sheet) Dkt. 498-1, p. 41 of 313 ("The total enterprise value under the Plan shall be $1.25 billion (the 'Plan Enterprise Value').") and (2) Disclosure Statement [Dkt 499], p. 52 ("The Plan Enterprise Value of the Debtors Set Forth in [the Amended] Restructuring Support Agreement ***Is Solely for Settlement Purposes and May Not Equal the Enterprise Value of the Debtors on the Effective Date***. ***The Debtors' Plan Enterprise Value set forth in the Restructuring Support Agreement has been agreed to by the Debtors and the Supporting Noteholders solely for settlement purposes.***"); *see also* Disclosure Statement [Dkt. 499] indicating that the exhibit setting forth the Liquidation Analysis, which would include asset and debt valuations, will be filed at a later date.") (emphasis added).

[4] *Id.*

Similarly, without an actual valuation of the Debtors, the Disclosure Statement fails to disclose the value of the stock in the Reorganized Debtors (the "Reorganized Equity") that will be distributed to certain administrative creditors and classified creditors in partial or full satisfaction of their clams pursuant to the Plan, which creates the potential that such creditors are being overpaid on their claims in violation of the absolute priority rule.   In addition, the Debtors fail to disclose the consolidated securities class action and other litigation that was commenced against the Debtors prepetition that has a direct impact on claims and the third party releases proposed under the Plan and discussed below.

Finally, the Disclosure Statement does not explain why, prior to the filing of the Chapter 11 cases, the Debtors failed to pursue efforts to pursue additional financing that was offered, failed to dispose of certain assets, failed to sell certain assets, and entered into certain sale transactions at a loss, prior to promoting a Plan that extinguishes Existing Equity.

c.    The Disclosure Statement should also not be approved because the Plan is patently not confirmable for several reasons:

i.    First, the Plan fails to satisfy the requirement of section 1129(a)(3), as it has not been proposed in good faith but, instead, as a means to take the value of Existing Equity and transfer it to other parties.

ii.    Second, by the Debtors' admissions and the valuation to be submitted by the Equity Committee in connection with confirmation there is value for Existing Equity.  Therefore, the Plan violates the best interests of creditors test of 11 U.S.C. § 1129(a)(7), as Existing Equity would receive a recovery if the

Debtors were liquidated in Chapter 7, yet the Plan provides for Existing Equity to be cancelled with no distribution.

        iii.      Third, even using the Debtors' Settlement Purposes Only Valuation, the Debtors have admitted that creditors receiving Reorganized Equity for their claims are receiving such Reorganized Equity at a substantial discount. As a result, the foregoing creditors are receiving in excess of a 100% return on their claims. As a result, the Plan violates the absolute priority rule of 11 U.S.C. § 1129(b), which prohibits the overpayment of senior claims to reduce or preclude recoveries for junior classes of claims or interests.

        iv.      Fourth, the Plan provides for extensive third party releases under conditions which are not permitted in the Fifth Circuit and which are prejudicial to shareholders. That is, parties that do not receive any consideration under the Plan, either because they are deemed to accept or deemed to reject the Plan, cannot be forced to opt-out of releases or be bound by such releases. Furthermore, the proposed timing for the proposed opt-out process effectively handicaps the ability for shareholders to opt-out of the releases as discussed below.

3.      From the standpoint of whether the Disclosure Statement provides "adequate information" to all interested parties, including shareholders, the most fundamental defect concerning the Disclosure Statement and the Plan, is the sleight of hand which is being used to under-value the Debtors' business. Valuation is the pretext behind the elimination of all equity interests in the Debtors. While the Disclosure Statement hearing is not the appropriate forum for litigating valuation, as will be discussed below, the myriad questions and highly suspect nature

of the Settlement Purposes Only Valuation demonstrates the profound inadequacy of the information necessary for parties in interest to evaluate the Plan and determine whether to support or oppose it.

4.      Indeed, nowhere in the Debtors' Disclosure Statement do the Debtors provide any credible explanation as to the cataclysmic evaporation of the value of Existing Equity between: (1) the Debtors' September 2018 10Q filed with the Securities and Exchange Commission (the "SEC"), wherein the Debtors stated that, as of September 30, 2018, the Company had (a) $2.860 billion in assets, (b) $1.885 billion in liabilities, and, therefore, (c) *$975 million in value for Existing Equity*,[5] (2) the Debtors' December 2018 10Q filed with the SEC, wherein the Debtors stated that, as of December 31, 2018, the Company had (a) $2.731 billion in assets, (b) $1.854 billion in liabilities, and, therefore, (c) *$877 million in value for Existing Equity*,[6] *versus* (3) the position the Debtors took in their Disclosure Statement and Plan, in which they claimed there would be no recovery for Existing Equity.  Thus, the Debtors base their Plan on their contention that over $850 million of value simply evaporated within six (6) months of filing for Chapter 11.

## II.      STATEMENT OF FACTS

## A.      THE DEBTORS' BUSINESS OPERATIONS AND EXISTING EQUITY VALUES REPORTED TO THE SECURITIES AND EXCHANGE COMMISSION AND THE BRISTOW GROUP, INC. PETITION.

---

[5] Due to the voluminous nature of the filed document, the relevant pages of the September 2018 10-Q are attached hereto as **Exhibit "B."**

[6] Due to the voluminous nature of the filed document, the relevant pages of the December 2018 10-Q are attached hereto as **Exhibit "C."**

70133072.1

5.      Bristow  Group,  Inc.  ("BGI"),  together  with  the  above-referenced  affiliated debtors  (with  BGI,  the  "Debtors")  and  their  non-debtor  affiliates  (with  the  Debtors,  the "Company"), is an international aviation services company.[7]

6.      Debtor BGI is a publicly held company whose common stock was traded on the NYSE under the ticker "BRS" before the bankruptcy filing[8] and whose stock is now traded over the counter.

7.      The Debtors provide aviation services through Bristow Helicopters Limited and Offshore Logistics, Inc., which were founded in 1955 and 1969, respectively.[9] The Debtors are headquartered in Houston and employs approximately 3,000 individuals worldwide.[10]

8.      On May 11, 2019 (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").[11]  As of the Petition Date, 35,918,916 shares  of  BGI's  $0.01 par  value  common  stock  ("Existing Equity")  were outstanding.[12]

9.      As of the Petition Date, the most recent consolidated balance sheet filed by the Debtors with the SEC was BGI's Quarterly Report for the period ended September 30, 2018.  In that Quarterly Report, BGI stated that, as of September 30, 2018, the Company had (a) $2.860 billion in assets, (b) $1.885 billion in liabilities, and, therefore, (c) ***$975 million in value for***

---

[7] *See* Declaration of Brian J. Allman in Support of the Debtors' First Day Motions (the "Allman Dec.") [Dkt. 25], ¶¶ 1 and 5.

[8] *See Allman Dec.* [Dkt. 25], ¶ 5.

[9] *Id.*

[10] *Id.*

[11] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

[12] Allman Dec. [Dkt. 25], ¶ 41.

*Existing Equity.*[13]   The foregoing is consistent with the disclosures in BGI's Voluntary Petition (the "BGI Petition").

10.     In the BGI Petition,[14] BGI indicated that, based on its foregoing Quarterly Report for the quarterly period ended September 30, 2018 filed with the SEC, the Company had (a) $2.860 billion in assets, (b) $1.855 billion in liabilities, and, therefore, (c) *$975 million in value for Existing Equity*."

11.     On or about June 19, 2019, BGI filed its Quarterly Report for the quarterly period ended December 31, 2018 with the SEC.   In this Quarterly Report, BGI stated that, as of December 31, 2018, the Company had (a) $2.731 billion in assets, (b) $1.854 billion in liabilities, and, therefore, (c) *$877 million in value for Existing Equity.*[15]

**B.     THE DEBTORS' DISCLOSURE STATEMENT AND PLAN AND THE MOTION FOR CONDITIONAL APPROVAL OF THE DISCLOSURE STATEMENT.**

12.     On August 1, 2019, the Debtors filed their Plan [Dkt. 498] and related Disclosure Statement [Dkt. 499].

13.     On August 8, 2019, the Debtors filed their DS Motion [Dkt. 520] seeking conditional approval of the Disclosure Statement and related relief regarding solicitation and Plan confirmation scheduling and procedures.

14.     The Plan divides all creditors and interest holders into 16 Classes, three of which – the Secured Notes Claim (Class 4), the Unsecured Notes Claims (Class 8), and the General Unsecured Claims (Class 12) – will receive stock in the Reorganized Debtors ("Reorganized

---

[13] *See* n. 5, supra, and **Exhibit "B"** hereto.

[14] A true and correct copy of the Bristow Petition is attached hereto as **Exhibit "D."**

[15] *See* n. 6, supra, and **Exhibit "C"** hereto.

Equity") and the right to participate in a rights offering to acquire additional Reorganized Equity in the Reorganized Debtors in exchange for their claims.[16]

15.     In addition, the holders of $150 million in unclassified, administrative priority DIP Facility Claims and related Equitization Consent Fee claims, which are described in the *Debtors' Motion For Entry Of An Order (A) Authorizing The Debtors To Obtain Postpetition Financing, (B) Authorizing The Debtors To Continue To Use Cash Collateral, (C) Granting Liens And Providing Superpriority Administrative Expense Status, (D) Modifying The Automatic Stay, And (E) Granting Related Relief* [the "DIP Motion"] [Dkt. 466], will also receive Reorganized Equity in exchange for their claims.[17]

16.     The Plan provides that Class 15, consisting of Existing Equity, will neither receive nor retain anything under the Plan.  Therefore, when the Plan goes effective, holders of claims in Classes 4, 8 and 12 will hold the substantial majority of the Reorganized Debtors' Reorganized Equity and consequently, its value.  The balance of the Debtors' Reorganized Equity, representing between 5.0% and 10.0% of the Reorganized Equity on a fully diluted basis, will be provided to members of the Reorganized Debtors' management under the Debtors' Management Incentive Plan (the "MIP"), including Mr. Don Miller, the Debtors' Chief Executive Officer.[18]

17.     Neither the Plan nor the Disclosure Statement states the value of the Reorganized Equity beingdistributed to the classes receiving equity pursuant to the Plan or to the Reorganized

---

[16] *See e.g.*, Plan [Dkt. 498], pp. 24-30 and Plan Exhibit "A" (the Amended RSA and Amended Restructuring Term Sheet).

[17] *See e.g.*, Plan [Dkt. 498], pp. 23-24 and Plan Exhibit "A" (the Amended RSA and Amended Restructuring Term Sheet).

[18] *See* (1) Plan [Dkt. 498], Exhibit "A" (the Amended RSA), at Exhibit "A" thereto (the Amended Restructuring Term Sheet) Dkt. 498-1, p. 40 of 313.

70133072.1

Debtors' management pursuant to the Plan and MIP.

18.     As discussed below, the value of such Reorganized Equity cannot be determined without a valuation of the Debtors' assets and liabilities.  However, the Debtors' Disclosure Statement and Plan do not include any such valuation.  Instead, the Disclosure Statement and Plan are premised on a Settlement Purposes Only Valuation providing a Plan Enterprise Value of $1.25 billion, with **no actual valuation**.[19]  The Disclosure Statement and Plan purport to extinguish Existing Equity because suddenly, based on this Settlement Purposes Only Valuation, there is no longer any value for Existing Equity, even though there was over $877 million in equity less than six months before the Petition Date.

19.     The Plan also provides for broad releases of numerous categories of persons and entities who are non-Debtors, which would purport to bind creditors and shareholders, without providing any consideration to them.  These releases are particularly offensive to shareholders in light of their potential claims against officers and directors. To make matters worse, the releases would be effective unless the releasing parties take affirmative steps to opt out of providing the releases and the limited timing proposed for submission of opt out forms will likely result in many stakeholders missing the opportunity to opt out of the releases.

### III.     ARGUMENT

**A.     THERE IS NO JUSTIFIABLE BASIS FOR THE TRUNCATED DISCLOSURE STATEMENT APPROVAL PROCESS.**

20.     The Debtors have requested that the Court approve the Disclosure Statement on an expedited basis without a justifiable basis.  The Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provide that parties in interest should have at least 28 days to object to approval of a disclosure Statement.  Fed. R. Bankr. P. 3017(a).  While it appears some courts

---

[19] *See* n.3, *supra*.

have permitted debtors to obtain "conditional approval" of a disclosure statement and then final approval of such disclosure statement at confirmation of the related chapter 11 plan, such procedure should be the exception and not the rule.  It should be the unique chapter 11 plan or set of circumstances that causes a court to deviate from the timelines prescribed by the Bankruptcy Rules.

21.     Here, the Debtors provide but two sentences that address their purported need for the expedited approval of the Disclosure Statement:

> The Combined Hearing will streamline and expedite the confirmation process and save the Debtors from additional administrative expenses that a two-stage process would require. The Debtors are confident that the costs to be saved and value thus preserved for creditors outweigh any concerns about proceeding with the final approval of the Disclosure Statement at the Combined Hearing.[20]

22.     If the basis for having a Combined Hearing was the saving of administrative expenses, then every single chapter 11 case marching towards confirmation would be ripe for a Combined Hearing thereby eviscerating the protections built into the Bankruptcy Rules.  While this is a larger case with many professionals and therefore sizeable administrative expenses, most such large and even larger chapter 11 cases all over the country do not have Combined Hearings. There is nothing unique about these cases that demand the expedited approval of the Disclosure Statement.

23.     Indeed, the true purpose of the truncated process appears to be to jam the Equity Committee so they have insufficient time to evaluate the Debtors' Settlement Purposes Valuation number and anticipated eve-of-confirmation filed supporting valuation materials.  The Equity Committee has had to resort to formal discovery and to appeal to this Court to assist with

---

[20] DS Motion [Dkt. 520], pp. 4-5.

obtaining the financial information it needs to prepare its own valuation, which is crucial to the Existing Equity receiving a recovery in these cases.  The Debtors' delay tactics regarding information sharing have put the Equity Committee in a position where it has had to play catch-up and the expedited Disclosure Statement process is unfair and exacerbates this challenge.  The Court should deny conditional approval of the Disclosure Statement and require that the Debtors abide by the Bankruptcy Rules proscribed timing for approval of the Disclosure Statement.

**B.**     **THE DISCLOSURE STATEMENT CONTAINS INADEQUATE INFORMATION.**

24.     A disclosure statement must provide parties in interest with sufficient information in order to make an informed judgment as to whether to support or oppose the proposed plan.[21] Among the information that needs to be included for a Disclosure Statement to contain adequate information is the following: (a) financial information, data, and valuations relevant to a party in interest's decision to accept or reject the Chapter 11 plan, (b) a liquidation analysis, (c) litigation, and (d) the events which led to the filing of the bankruptcy case.  *In re Divine Ripe, L.L.C.*, 554 B.R. 395, 402 (Bankr. S.D. Tex. 2016).  Although shareholders are being deprived of the right to vote, they nevertheless have the right to be heard with regard to the Disclosure Statement and Plan and, accordingly, have the right to object to the inadequacy of the information provided in the Disclosure Statement.  11 U.S.C. § 1109(b).  A party in interest has the right to object to inadequacy of a disclosure statement, even if it would not affect its vote.  *Everett v. Perez (In re*

---

[21] *See* Section 1125 providing that a disclosure statement can only be approved if it contains "adequate information," which is defined as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records … that would enable … a hypothetical investor of the relevant class to make an informed judgment about the plan, but … in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a) and (b).

*Perez*), 30 F.3d 1209 (9th Cir. 1994).

25.    The Disclosure Statement is seriously inadequate in failing to provide, at the very least, the following material information:

a.    **Valuation** - The Disclosure Statement provides only the Settlement Purposes Only Valuation of $1.25 billion.  There is absolutely no information or basis to support such valuation, which is the purported basis for cancelling Existing Equity and providing no distribution thereto.

As a result, as further discussed below in regard to the Plan being patently unconfirmable, without an actual valuation, there is no meaningful way for the Court or parties in interest to determine whether the Plan (i) is being proposed in good faith under Section 1129(a)(3) (which requires that the Plan be proposed for a legitimate and honest purpose consistent with the purposes of the Bankruptcy Code), (ii) satisfies the best interests creditors test, as required for confirmation under Section 1129(a)(7), and (iii) is fair and equitable as is required to cram down Existing Equity under Section 1129(b), and in particular whether the Plan violates the absolute priority rule.  More specifically, if an actual valuation shows that Existing Equity is in the money or that creditors being paid with Reorganized Equity are being overpaid on their claims, then the Plan would not satisfy multiple sections of Section 1129 as follows:

i.    *Section 1129(a)(3).*  If the Existing Equity is in the money, then the Plan, which seeks to cancel Existing Equity and provide nothing to the holders thereof, while simultaneously transferring the value of the Debtors' equity to certain creditors and insiders, is not being proposed in good faith.  In that case, section 1129(a)(3) is not satisfied.  *See* 11 U.S.C. § 1129(a)(3).

70133072.1

ii.      *Section 1129(a)(7)*.  In order to satisfy the best interests of creditors test under Section 1129(a)(7), the Debtors need to provide an actual valuation and a related liquidation analysis to show whether or not Existing Equity would receive a distribution in a hypothetical Chapter 7.[22]  *See* 11 U.S.C. § 1129(a)(7).  In addition to including no valuation, the Disclosure Statement fails to include a liquidation analysis.[23]

iii.      *Section 1129(b)*.  In order to cram down the Plan on Existing Equity, the Debtors are required to show that the Plan is fair and equitable as to Existing Equity,  11 U.S.C. § 1129(b)(1) and (2)(C).  In order for the Plan to be fair and equitable, it must satisfy the absolute priority rule.  Here, the Plan provides that certain administrative creditors and classified creditors will have their claims paid with Reorganized Equity.  If the Reorganized Equity being provided under the Plan results in the overpayment of such creditors, then the absolute priority rule is not satisfied.  *See In re Idearc Inc.*, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009), *subsequently aff'd sub nom. In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011) ("[t]he corollary of the absolute priority rule is that senior classes cannot receive more than a one hundred percent (100%) recovery for their claims."); *see also* numerous other cases cited below providing the same rule.

Based on the foregoing, without a valuation, there is no way to determine the value of the Reorganized Equity beingdistributed under the Plan and, therefore,

---

[22] *See* Disclosure Statement [Dkt. 499] (1) p. 61 (indicating that a liquidation analysis, which the Equity Committee assets could only be prepared once there is an actual valuation of the Debtors, is required to show that the best interests of creditors test is satisfied) and (2) p. xi, n. 3 (indicating that the exhibits to the Disclosure Statement, including the liquidation analysis have not yet been filed).

[23] *Id.*

whether certain creditors are being overpaid.  For this reason, the failure to include a valuation with the Disclosure Statement results in a lack of adequate information.  *In re Trans Max Techs., Inc.*, 349 B.R. 80, 89 (Bankr. D. Nev. 2006) ("As stated in Collier, '[t]his [absolute priority rule] component of the fair and equitable rule will require valuation of the debtor in every case in which the plan proposes to eliminate equity or any junior class of creditors.' 7 Collier, *supra,* at ¶ 1129.04[4][a][ii]; *see also* H.R. Rep. 595, 95th Cong., 1st Sess. 414 (1977) ('[A] valuation of the debtor's business ... will almost always be required under Section 1129(b) in order to determine the consideration to be distributed under the plan.'). This valuation ensures that no class surviving confirmation will be paid more than in full through the capture of value that rightly belongs to the eliminated class.")

      **b.**    **Pending Securities Class Action** - The Debtors fail to disclose the consolidated securities class action that was commenced prepetition, which action has a direct impact on the third party releases proposed under the Plan, as well as claims to be treated by the Plan.  More specifically, in BGI's Statement of Financial Affairs, BGI disclosed that it is engaged in the following consolidated class action:[24]

| **Case Title** | **Case Number** | **Nature of Case** | **Court** | **Basis for Claims** |
|---|---|---|---|---|
| Svetlana Kokareva, Individually and On Behalf of All Others Similarly Situated v. Bristow Group Inc., Jonathan E. Bailiff, and L. Don Miller | Case 4:19-cv-0509 (Lead Case) | Securities Fraud | U.S. District Court For The Southern District Of Texas | This class action was brought on behalf of all purchasers of BGI securities during the period February 8, 2018 and February 12, 2019 pursuant to 15 U.S.C. §78u-4(a)(3)(B).<br><br>The claims in this class action arise from the purchase or acquisition of |

---

[24] *See* BGI's Statement of Financial Affairs [Dkt. 424, pp.84-86 of 103.

| | | | | |
|---|---|---|---|---|
| | | | | securities of BGI Bristow Group Inc. between February 8, 2018 and February 12, 2019 for Violations of the Federal Securities Laws. Defendants include BGI, Jonathan E. Baliff (Debtors' former chief executive officer), and L. Don Miller (Debtors' current chief executive officer and former chief financial officer). |
| Daniel Lilienfeld, Individually and On Behalf of All Others Similarly Situated v. Bristow Group Inc., Jonathan E. Bailiff, and L. Don Miller | Case 4:19-cv-1064 | Securities Fraud | U.S. District Court For The Southern District Of Texas | Similar to the foregoing. |

In addition to the foregoing consolidated securities class action, BGI's Statement of Financial Affairs also disclosed a number of other pending litigation matters. However, the Disclosure Statement does not materially or adequately describe or discuss the foregoing securities class action and other litigation and the potential impacts thereof, which is important given the broad releases, including third party releases, the Debtors are seeking to effectuate through their Plan.[25]

As a result of the failure to disclose the foregoing litigation and potential impacts thereof, the Disclosure Statement does not contain adequate information. See *In re Mickey's Enterprises, Inc.*, 165 B.R. 188, 194 (Bankr. W.D. Tex. 1994) (citing *Westland Oil Development Corp. v. MCorp Management Solutions, Inc. v. Federal Deposit Insurance Corp.,* 157 B.R. 100, 102 (S.D. Tex. 1993)) ("A disclosure statement, to be adequate, should disclose all litigation likely to arise in a non-bankruptcy context.")

---

[25] *See* Plan [Dkt. 498], p. 47 at Article VIII, Section C.

c.     **Pre-Petition Date Conduct** - The Disclosure Statement does not explain

why, prior to the filing of the Chapter 11 cases, the Debtors failed to pursue efforts to

pursue additional financing that was offered, failed to dispose of certain assets, failed to

sell certain assets, and entered into certain sale transactions at a loss, prior to promoting a

Plan that extinguishes Existing Equity.   *See* ¶¶ 31 through 33, *supra*, discussing the

foregoing.

26.     Absent the foregoing information, and in particular an actual valuation of the

Debtors, the Disclosure Statement fails to contain the requisite adequate information and should

not be approved.

## C.     THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE THE DEBTORS' PLAN IS PATENTLY NON-CONFIRMABLE.

27.     Confirmation issues usually are reserved for the confirmation hearing, and not

addressed at the disclosure statement hearing.  *In re A. Capital Equip., LLC*, 688 F.3d 145, 153

(3d. Cir. 2012).  However, if it appears there is a defect that makes a plan inherently or patently

unconfirmable, the Court may consider and resolve that issue at the disclosure stage thus

avoiding the time and expense of a solicitation process and a confirmation hearing for a plan that

is dead on arrival.  *Id.* (citations omitted); *see also In re U.S. Brass Corp.*, 194 B.R. 420, 422

(Bankr. E.D. Tex 1996) ("Disapproval of the adequacy of a disclosure statement may sometimes

be appropriate where it describes a plan of reorganization which is so fatally flawed that

confirmation is impossible"); *In re Felicity Assoc., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996)

("[i]t has become standard Chapter 11 practice that when an objection raises substantive plan

issues that are normally addressed at confirmation, it is proper to consider and rule upon such

issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face").

28.     Applying Bankruptcy Rule 7042 and 9014(c), this Court has held that it can and

should address issues, which may render a plan facially unconfirmable before approving dissemination of a disclosure statement and plan. *See In re ReoStar Energy Corp.,* 2012 WL 1945801, at \*4 (Bankr. N.D. Tex. May 30, 2012).  In *ReoStar,* this Court, after considering objections, required the debtors to demonstrate at a hearing, if their proposed plan was feasible under section 1129(a)(11), whether it complied with section 1129(a)(1), and whether it was filed in good faith under section 1129(a)(3).  *Id.*  The Court should likewise prevent dissemination of the Disclosure Statement and Plan because the Debtors' Plan cannot be confirmed for the reasons set forth below.

1.  **THE PLAN VIOLATES BANKRUPTCY CODE SECTION 1129(A)(3) AS IT WAS NOT PROPOSED IN GOOD FAITH.**

29.     Section 1129(a)(3) provides in pertinent part that the court shall confirm a plan only if "[t]he plan has been proposed in good faith and not by any means forbidden by law." Although "good faith" is not defined in the Bankruptcy Code, it is well settled that the requirement of good faith must be viewed "in light of the totality of circumstances" surrounding the establishment of a Chapter 11 plan. *Matter of Sun Country Dev., Inc*., 764 F.2d 406, 408 (5th Cir. 1985). "A plan is proposed in good faith only '[w]here [a] plan is proposed with the *legitimate and honest purpose* to reorganize and has a reasonable hope of success.'" *In re Star Ambulance Service, LLC*, 540 B.R. 251, 262 (Bankr. S.D. Tex. 2015) (quoting *In re Village at Camp Bowie I, L.P.,* 710 F.3d 239, 247 (5th Cir. 2013) (emphasis added).

30.     Some courts have added "good intentions" to the requirement of honesty, *In re Coram Healthcare Corp*., 271 B.R. 228, 234 (Bankr. D. Del. 2001), and have observed, for example, that "good faith has been found to be lacking if the plan was proposed for ulterior motives." *Palatine Nursing Home, a Partnership v. Glessing (In re Koelbl),* 751 F.2d 137, 139 (2nd Cir. 1984) (citing *Gonzalez Hernandez v. Borgos*, 343 F.2d 802, 805 (1st Cir. 1965)).  In

determining good faith, a court also "may include consideration of the plan proponent's prepetition conduct." *In re Mortgage Investment Company of El Paso, Texas*, 111 B.R. 604, 611 (Bankr. W.D. Tex. 1990).

> a. **The Debtors' Rejection of Prepetition Opportunities, Which Could Have Prevented the Filing of the Bankruptcy Cases, Demonstrates that the Plan Has Not Been Proposed in Good Faith in Violation of Section 1129(a)(3).**

31.     The Equity Committee respectfully submits that a plain and fair consideration of the "totality of circumstances" in this case – including, in particular, the prepetition conduct of the Debtors and their management – demonstrates that the Plan has not been proposed in good faith; to the contrary, the proposed Plan is merely the culmination of a strategic effort to use the bankruptcy process to effectively steal the Existing Equity and leave legitimate shareholders holding an empty bag.  There were numerous instances where the Debtors were presented with opportunities to raise significant cash and avoid filing bankruptcy, but in each instance, and for no comprehensible reason (other than to pursue their strategy), the Debtors rejected each and all of these proposals.  For example:[26]

- Mackenzie Investments proposed a $150 million equity line of credit, and Solus Alternative Asset Management sent the Debtors a term sheet for financing in excess of $100 million, but the  Debtors effectively rejected both offers;

- BGI's fleet of 16 H225 helicopters has not operated commercially since 2016.  No meaningful attempts have been made to sell these assets despite the fact that at least one buyer approached the company to purchase some portion of these assets;

- BGI was negotiating the sale of its equity stake in Líder Táxi Aéreo S.A., a provider of helicopter aviation services in Brazil and an unconsolidated affiliate of BGI.

---

[26] The Equity Committee is prepared to explain to the Court at length each of the following events, but for the sake of brevity provides only these highlights.

Shortly before the transaction was to close, BGI inexplicably rejected the transaction, management (Don Miller) simply stating that he "didn't like the buyer's business model;"

• Immediately prior to bankruptcy, the Debtors sold an asset, Eastern Airways, a regional scheduled-service airline serving offshore transportation hubs in Great Britain. This asset was nearly or entirely unencumbered by debt by the time it was sold, and was widely forecasted to be EBITDA positive in future financial periods. Yet the Company not only sold Eastern Airways at a huge discount to intrinsic value, it actually **contributed** approximately $22 million in working capital to the transaction;

• BGI owns Airnorth, a regional scheduled-service airline serving offshore transportation hubs and mining operations in Australia. Airnorth not only has substantial value and is nearly or entirely unencumbered, **it is not core to the Debtors' operations**, yet the Debtors refuse to sell it. (In fact, Australia is a very difficult market, and industry experts generally agree that all of BGI's Australia operations should be sold.);

• BGI bungled a certain transaction involving its proposed acquisition of Columbia Helicopters, Inc., as a result of which it had to pay a $20 million termination fee. Certain shareholders objected to paying such an enormous fee at a time when the Debtors were purportedly in dire financial condition, and even offered to introduce the company to an alternate buyer that was willing to pay the same price, which would have allowed BGI to avoid having to pay the $20 million termination fee. BGI simply ignored these objections and the offer, and readily paid the $20 million termination fee; and

• The proposed $560 million Columbia Helicopter transaction was to be partially funded through the issuance of $135 million of newly issued convertible debt. As a result of "unusual" trading volume in BGI's stock and a consequent rapid price

deterioration during the VWAP measurement period defined in the offering documents (which certain investors have petitioned the SEC to investigate), the resulting dilution upon conversion of these debentures would have amounted to 73.4%. While it appears that the convertible noteholders would have done very well, it is instructive that BGI omitted any protection for existing shareholders, such as a cap on the conversion rate or a floor on the conversion price. Although the Columbia Helicopter transaction was not completed (requiring BGI to pay the aforementioned $20 million termination fee), BGI's conduct certainly manifested a deliberate action by management to divest existing shareholders of their interest in the company, and gives rise to at least the strong suspicion of collusion between management and its debt investors.

32. In addition to these failed transactions, the Debtors refused to consider cost cutting measures brought to their attention by certain shareholders that, if implemented, might have saved $100-150 million. Further, to the best of the Equity Committee members' knowledge, the Debtors' board never seriously considered the sale of the company as an alternative to filing Chapter 11.

33. Notwithstanding the multiple missed opportunities to raise or conserve cash to address liquidity issues, the Debtors elected to file chapter 11 cases and propose a Plan that wipes out Existing Equity even though there was $877 million in value for Existing Equity at the end of 2018. This prepetition conduct demonstrates a lack of good intentions and that ulterior motive, rather than a legitimate and honest purpose, has driven the Debtors' effort to confirm the Plan. Accordingly, the Plan has not been proposed in good faith as required by Section 1129(a)(3) and is patently non-confirmable.

**b.** **The Plan Has No Reasonable Hope of Success and Fails to Satisfy Section 1129(a)(3).**

34.     The second prong of the test for good faith under § 1129(a)(3) (the first prong being that the Plan is proposed for a "legitimate and honest purpose" *supra*.) is that the plan must have a reasonable hope of success.  *Matter of Briscoe Enterprises, Ltd. II*, 994 F.2d 1160, 1167 (5th Cir. 1993).   Here, scrutiny of the Debtors' Plan itself demonstrates why it cannot be confirmed and, therefore, fails to satisfy the § 1129(a)(3) test.

35.     First and foremost, as explained in much greater detail in other parts of this Objection, the Plan relies on a contrived valuation that Debtors acknowledge "is solely for settlement purposes and may not equal the Enterprise Value of the Debtors on the Effective Date."[27]   Thus, the Plan does not provide a legitimate valuation that would allow a fair and reasonable basis for evaluating it.  Not coincidentally, based on this unsubstantiated "Settlement Purposes Only Valuation" of $1.25 billion, Existing Equity is purportedly "out of the money" and will receive nothing while other classes, such as certain Secured Notes claimants, Unsecured Notes claimants, General Unsecured claimants and Debtors' management will receive Reorganized Equity in the Reorganized Debtors, either at a discount or for no consideration, and the right to participate in a rights offering to acquire additional Reorganized Equity.  As discussed herein, one net result of the Debtors' unfair and inequitable Plan is that certain classes will receive consideration in excess of the value of their claims, which is prohibited by the absolute priority rule.

36.     The Plan also cannot be confirmed because it purports to bind creditors and shareholders to  broad third party releases to be provided to various insiders of the Debtors.[28]  Besides being provided for no consideration, the releases appear to be illegal, improper and

---

[27] *See* n. 19, *supra*.

[28] *See* Plan [Dkt. 498], p. 47 at Article VIII, Section C.

contrary to established Fifth Circuit law.  *See e.g., Bank of New York Trust Co. v. Off'l Unsecured Creditors' Comm. (In re Pacific Lumber Co.*), 584 F.3d 229, 253 (5th Cir. 2009). These releases are particularly offensive to shareholders in light of their potential claims against officers and directors.

37.     Further, as discussed below, the Plan fails the "best interests" of creditors test, the hypothetical application of Chapter 7 to a Chapter 11 plan, wherein a liquidation analysis is performed to see whether each holder of a claim or interest in each impaired class will receive at least what the holder would receive in a hypothetical Chapter 7. By the Debtors' own admissions, Existing Equity would be in a far better position if the Debtors were liquidated in a Chapter 7, rather than being wiped out completely under the Plan.

38.     Finally, in addition to all of the foregoing concerns, the Plan is effectively a "cover" for the effort by management and certain creditors to reap an extraordinary windfall at the expense of Exisiting Equity.  No more vivid illustration exists than the proposed 2020 compensation of Don Miller, BGI's chief executive officer.  Mr. Miller will receive an annual base salary equal to $700,000 (up from $425,006 last fiscal year).  Together with various enhancements (ex., Long Term and Short Term Incentive Plans), it appears that Mr. Miller's total compensation for fiscal 2020 will approximate $7.1 million, as compared with his total compensation in fiscal 2018 of $2.050 million and $1.602 in fiscal 2017.  Moreover, this compensation package does not include the Rerorganized Equity Mr. Miller will receive.

39.     For the reasons discussed above and explained in greater detail below, the Plan has not been proposed in good faith and instead has been proposed for the improper purpose of eliminating the rights of Existing Equity while providing value to other creditors in excess of their claims.  This ulterior (albeit very transparent) motive behind the Plan, see *In re Koelbi*

*supra*, belies any suggestion that the plan has a "legitimate and honest purpose."  Furthermore, precisely because the Plan has been formulated for this improper purpose, the Plan contains provisions that violate the Bankruptcy Code and cannot be confirmed.  The Plan, therefore, does not satisfy the requirement of good faith under Section 1129(a)(3).

> **2.      THE PLAN VIOLATES THE BEST INTERESTS OF CREDITORS TEST UNDER BANKRUPTCY CODE SECTION 1129(A)(7), BECAUSEEXISTING EQUITY WOULD RECEIVE A DISTRIBUTION IN CHAPTER 7, YET THE PLAN PROVIDES THAT EXISTING EQUITY WILL BE CANCELLED WITH NO DISTRIBUTION.**

40.      In order to confirm the Plan, the Debtors must satisfy the "best interests" of creditors test set forth in Section 1129(a)(7), which provides that, "[w]ith respect to each impaired class of … interests, (A) each holder of a[n] … interest of such interest (i) has accepted the plan; or (ii) will receive or retain under the plan on account of such … interest property of a value, as of the effective fate of the plan, that is not less than the value of such holder would receive or retain if the debtor were liquidated under chapter 7."  11 U.S.C. § 1129(a)(7).  Satisfaction of the "best interests" of creditors test is "[o]ne of the most fundamental prerequisites to confirmation of a proposed plan of reorganization."  *S. Pac. Transp. Co. v. Voluntary Purchasing Groups, Inc.*, 252 B.R. 373, 390 (E.D. Tex. 2000).

41.      In this case, the Plan provides that members of Class 15, which contains Existing Equity, will have their Existing Equity cancelled and will receive nothing under the Plan.  Therefore, Class 15 is deemed to have rejected the Plan and is not entitled to vote to accept it.  As a result, the Debtors have to demonstrate that the holders of Existing Equity will receive at least as much as they would receive in a Chapter 7 liquidation – stated conversely, that the holders of Existing Equity would not receive anything in a Chapter 7 liquidation.

42.      Here, the Debtors have admitted that they fail the "best interests" of creditors test.

In connection with the Plan, the Debtors have only provided a Settlement Purposes Only Valuation and not a valuation based on evidence.  Therefore, the only valuation with a basis in fact is the one provided by the Debtors in their December 2018 10Q filed with the SEC, wherein the Debtors stated that, as of December 31, 2018, the Company had (a) $2.731 billion in assets, (b) $1.854 billion in liabilities, and, therefore, (c) ***$877 million in value for Existing Equity.***[29]

43.     Based on the Debtors' admission that there was $877 million in value for Existing Equity as of December 31, 2018, the Debtors cannot satisfy the "best interests" of creditors test as required by Section 1129(a)(7).  Further, even if the Debtors' submit evidence in connection with confirmation that controverts the $877 million value for Existing Equity, the Debtors will be hard pressed to explain how the entire $877 million in equity suddenly vanished in the space of eight months.

3.     **THE PLAN CANNOT BE CRAMMED DOWN ON THE CLASS OF EXISTING EQUITY INTERESTS PURSUANT TO 11 U.S.C § 1129(B), BECAUSE THE PLAN IS NOT FAIR AND EQUITABLE,  AS IT WIPES OUT EXISTING EQUITY WHILE PROVIDING SENIOR CLASSES WITH RECOVERIES IN EXCESS OF THEIR CLAIMS.**

44.     Since the Plan provides that Class 15, which contains Existing Equity, is deemed to have rejected the Plan because members of Class 15 will have their Existing Equity cancelled and will receive nothing under the Plan, the Plan can only be confirmed if the Debtors meet the cram down requirements of Section 1129(b).

45.     Section 1129(b) requires that the Plan "not discriminate unfairly, and [that it] is fair and equitable, with respect to each class of … interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1).

46.     For the purposes of Section 1129(b),

---

[29] *See* n. 6, supra, and **Exhibit "C"** hereto.

the condition that a plan be fair and equitable with respect to a class *includes* the following requirements:

…

(C) With respect to a class of interests—

(i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

11 U.S.C. § 1129(b)(2)(C) (emphasis added) (often referred to as the "absolute priority rule"). Due to the fact that Section 1129(b)(2)(C) uses the word "includes," Section 1129(b)(2)(C) "expressly leaves room for additional factors to be considered in applying the principle [of the absolute priority rule] in other particular circumstances." *In re Bonner Mall Partnership,* 2 F.3d 899, 912 (9th Cir.1993).

47.     Indeed, importantly here, ***"[t]he corollary of the absolute priority rule is that senior classes cannot receive more than a one hundred percent (100%) recovery for their claims."*** *In re Idearc Inc.*, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009), *subsequently aff'd sub nom. In re Idearc, Inc.,* 662 F.3d 315 (5th Cir. 2011); *see also In re MCorp Fin., Inc., 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992), appeal dismissed and remanded*, 139 B.R. 820 (S.D. Tex. 1992), *abrogated on other grounds by In re Briscoe Ents., Ltd., II,* 994 F.2d 1160, 1164 n.11 (5th Cir. 1993) ("***If former shareholders' interests are impaired and a class of creditors is provided for more than in full, the plan will not be confirmed. Conversely, for a plan to be confirmed when stockholders are eliminated, creditors must not be provided for more than in full.***"); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001) ("***[a] corollary of the***

*absolute priority rule is that a senior class cannot receive more than full compensation for its claims."*); *In re Acis Capital Mgmt., L.P.*, No. 3:18-CV-1056-D, 2019 WL 3228916, at *34 (N.D. Tex. July 18, 2019) (same); *In re Trans Max Techs., Inc.*, 349 B.R. 80, 89 (Bankr. D. Nev. 2006) (*"One component of the fair and equitable treatment is that a plan may not pay a premium to a senior class."*).  The legislative history of Section 1129 also demonstrates that where a senior class of creditors receives more than payment in full on their claims, the absolute priority rule is not satisfied.  *See, e.g.,* H.R. Rep. 95-595, 414, 1978 U.S.C.C.A.N. 5963.

48.     The Debtors have merely provided a Settlement Purposes Only Valuation of $1.25 billion and not a valuation based on evidence.  Even at the Settlement Purposes Only Valuation, which is disputed by the Equity Committee, the Plan violates the absolute priority rule, because creditors are being overpaid, as follows:

a.     First, pursuant to the Plan, the holders of the Secured Notes Claim (Class 4) will have their claims paid in full, partially through receiving Reorganized Equity.[30] However, as discussed in the Equity Committee's *Opposition To Debtors' Motion For Entry Of An Order (A) Authorizing The Debtors To Obtain Postpetition Financing, (B) Authorizing The Debtors To Continue To Use Cash Collateral, (C) Granting Liens And Providing Superpriority Administrative Expense Status, (D) Modifying The Automatic Stay, And (E) Granting Related Relief* [the "DIP Opposition"] [Dkt. 547], by the Debtors' own admission, Reorganized Equity is being issued at a *XX*%[31] discount.[32]  Therefore, by

---

[30] Plan [Dkt. 498], p. 26 (Treatment of Class 4); Disclosure Statement [Dkt. 499], p. 6 (Treatment of Class 4).

[31] The discount percentage is redacted here, as it was in the DIP Opposition due to non-disclosure agreements between the Equity Committee and the Debtors that are in place.  The discount is material.

[32] DIP Opposition [Dkt. 547], ¶¶ 5 and 51, and Declaration of Alexander V. Rohan in support of the DIP Opposition, ¶¶ 13 and 14.

the Debtors' own admission, the foregoing Class 4 claims are receiving an overpayment on their claims.

     **b.**    Second, pursuant to the Plan, the holders of the $150 million in unclassified, administrative priority DIP Facility Claims and related Equitization Consent Fee claims will have their claims paid in full, partially through receipt of Reorganized Equity.[33]  As was the case with the foregoing Class 4 creditors, since there is a large discount on the Reorganized Equity being issued to the holders of DIP Facility Claims, they will receive an overpayment on their claims.

Since the Plan provides for the overpayment of claims due to the discount on Reorganized Equity being exchanged for certain claims, the Plan violates the absolute priority rule required to cram down the Existing Equity.  Therefore, the Plan is not confirmable.

In addition, in connection with confirmation, the Equity Committee intends to submit its own valuation of the Debtors that will show that there is value for Existing Equity, which, together with the overpayment of certain creditors described above, further demonstrates that the Plan violates the absolute priority rule.

     **4.**    <u>**THE PLAN CONTAINS ILLEGAL THIRD PARTY RELEASES.**</u>

     49.    The Plan contains impermissible and improper provisions pertaining to releases (collectively, the "<u>Release Provisions</u>").[34]  These Release Provisions are illegal, improper and contrary to well-established Fifth Circuit law as well as case law decided in other circuits. *Bank of N.Y. Trust  Co. v. Off'l Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229,253 (5th Cir. 2009). In particular, the proposed opt-out releases where creditors and equity

---

[33] Plan [Dkt. 498], pp. 23-24 (DIP Facility Claims); Disclosure Statement [Dkt. 499], p. 5 (DIP Facility Claims).

[34] *See* Plan [Dkt. 498], p. 47 at Article VIII, Section C.

holders are required to take an affirmative action in order to not be bound by a release are not consensual releases. *In re SunEdison, Inc.*, 576 B.R. 452, 458 (Bankr. S.D.N.Y. 2017); *see also*, *In re Chassix Holdings, Inc.*, 533 B.R. 64, 88 (Bankr. S.D.N.Y, 2015) (holding that "[c]harging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying  a "'consent' to the third party release based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point.").

50.     In particular, under the Debtors' proposed procedures, even parties who are deemed to accept or reject the Plan are required to send in opt-out notices by a date certain or be deemed bound by the Release Provisions.[35]   In the recent case of PHI, Inc., Case No. 19-30923-hdh11, pending in the United States Bankruptcy Court for the Northern District of Texas Dallas Division, the Honorable Judge Hale ruled that parties that are deemed to accept or reject the Plan cannot be defaulted into an opt out of a release under Fifth Circuit law. *See*, PHI, Inc., Case No. 19-30923-hdh11, United States Bankruptcy Court Northern District of Texas Dallas Division, *Findings of Fact, Conclusions of Law, Order Confirming Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [PHI, Inc., Docket No. 880, pp. 57-58, Para. 67]. Even though Existing Equity is to be provided an opt out form to mail in to the Debtors, since the Existing Equity is being extinguished under the Plan, such an opt out process is not permitted in the Fifth Circuit

51.     The Release Provisions are but another example of the lack of good faith, which the Debtors have demonstrated in proposing the Plan which divests all shareholders of valuable ownership interests based solely on the unsubstantiated Settlement Purposes Only Valuation.

---

[35] *See* DS Motion, ¶¶ 45 and 46 and Exhibit "5" (the "Presumed to Reject Notice") thereto.

The insertion of the Release Provisions inflicts even more harm on shareholders by depriving them of rights to pursue legitimate and valuable claims against third parties (who are providing no value and no consideration in exchange for the releases), and adds significant additional injury to what is already a gross insult.

52.     Even if the Court was to somehow rule differently than Judge Hale regarding the Release Provisions, the timing for submission of the opt-out will prejudice shareholders.  Per the DS Motion, the solicitation process, and presumably (although it is not spelled out) the mailing of the opt-out notice is to occur five days after the Disclosure Statement Order is entered. Assuming the best circumstances, that the Court grants the DS Motion on August 21, 2019 and enters the Disclosure Statement Order that same day, the Debtors would serve the opt-out notice with the solicitation materials on August 26, 2019.  Also not clear is when the opt-out election return deadline is to be set, but assuming it is the voting deadline, the opt-out form return deadline would be August 18, 2019, or only 23 days after mailing. Given that many shareholders hold through beneficial holders, it is almost certain that shareholders will not have sufficient time to receive, review and timely return the opt out election form. This timing may be inadvertent or by design, but it is certainly prejudicial to Existing Equity.

53.     Further, the Equity Committee asks that it be permitted to include a letter with the solicitation packages to send to Existing Equity advising them of the significance of the opt out election form, the deadline to submit the election form, the securities class action, and providing a recommendation that they not opt out of the releases. Absent such an instruction letter, it is unlikely that most Existing Equity holders will understand the ramifications of electing or not electing to opt out of the releases.

IV.     **CONCLUSION**

**WHEREFORE**, the Equity Committee respectfully requests that the Court (1) deny the DS Motion (2) deny approval of the Disclosure Statement, and (3) grant such other and further relief as may be just and proper.

Respectfully submitted this 19th day of August, 2019.

**POLSINELLI PC**

By: /s/ Trey A. Mounsour_____
Trey A. Monsour (SBN 14277200)
POLSINELLI PC
1000 Louisiana Street Suite 6400
Houston, Texas 77002
Telephone: (713) 374-1643
Facsimile No.: (713) 374-1601
tmonsour@polsinelli.com

- and –

David B. Golubchik (*pro hac vice* approved)
Eve H. Karasik (*pro hac vice* approved)
Todd M. Arnold (*pro hac vice* approved)
LEVENE, NEALE, BENDER, YOO &
BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
dbg@lnbyb.com; ehk@lnbyb.com
tma@lnbyb.com

*Attorneys For Ad Hoc Committee Of*
*Equity Security Holders*

**<u>Certificate of Service</u>**

I, Trey A. Monsour, do hereby certify that on this 19th day of August 2019, this Opposition was served on all parties entitled to service under the Court's ECF system.

*<u>/s/ Trey A. Monsour</u>*
Trey A. Monsour

70133072.1